# EXHIBIT A

Nicholas J. Drakulich (SBN: 98135)
Robert J. Drakulich (SBN: 281575)
**THE DRAKULICH FIRM, APLC**
2727 Camino Del Rio S., Suite 322
San Diego, CA 92018
Tel: (858) 755-6887
Fax: (858) 755-6456
njd@draklaw.com
rjd@draklaw.com

Daniel J. Thornburgh (PHV Applicant)
Nathan Bess (PHV Applicant)
**AYLSOCK, WITKIN, KREIS &
OVERHOLTZ, PLLC**
17 E. Main Street, Suite 200
Pensacola, FL 32502
Tel: (850) 202-1010
Fax: (850) 916-7449
dthornburgh@awko.com
nbess@awko.com

*Attorneys for Plaintiff,* CLAUDIA HAYES

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**01/14/2022** at 04:40:49 PM

Clerk of the Superior Court
By Vanessa Sezenol,Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO - UNLIMITED CIVIL

| | |
|---|---|
| CLAUDIA HAYES, | **CASE NO.:** 37-2022-00001812-CU-PL-CTL |
| Plaintiff, | |
| v. | **COMPLAINT FOR DAMAGES** |
| EISAI, INC., ARENA PHARMACEUTICALS, INC., and DOES 1-100, inclusive, | **(1) NEGLIGENCE**<br>**(2) STRICT LIABILITY – FAILURE TO WARN** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

Plaintiff, by and through undersigned counsel, hereby sues EISAI, INC. ("EISAI"), ARENA

PHARMACEUTICALS, INC. ("ARENA"), and DOES 1-100 (collectively, "Defendants") and upon

information and belief alleges as follows:

**INTRODUCTION**

1.      Defendants manufactured and distributed a prescription diet pill that causes cancer, including the rectal cancer Plaintiff developed after taking the diet pill for years.  Defendants knew of the increased cancer risks from as early as the pre-clinical animal studies and yet they never warned of the risk of cancer in the drug's label.  Additionally, Defendants never properly tested the drug or monitored the reported adverse events of the drug.  The FDA (not the Defendants) did its own safety data analysis of the clinical trial data,  as well as the adverse events reported as to cancer and determined that the drug causes cancer.  After which the FDA recalled the drug from the market.

2.      This is an action for damages related to Defendants' wrongful conduct in connection with the development, testing, clinical trials, manufacturing, packaging, labeling, promoting, advertising, marketing, distribution and selling of lorcaserin hydrochloride as Defendants' prescription weight loss drug Belviq® (hereinafter "Belviq"), which was later recalled by FDA because it causes cancer.

3.      Belviq's primary purpose is for chronic weight management in addition to reduced-calorie diet and increased physical activity.  Belviq is manufactured as a pill suitable for oral consumption.

4.      At all relevant times herein, Defendants were on notice, knew, or should have known that Belviq could cause cancer or that cancer, including Rectal Cancer, was a foreseeable risk of Belviq. Defendants failed to provide adequate warnings concerning Belviq's cancer risk to Plaintiff and to her prescribing physicians.  Defendants failed to conduct adequate tests and to perform a careful analysis of these tests and the safety data which would have revealed increased cancer risks.

5.      Nevertheless, at all times Plaintiff was prescribed, purchased, and ingested Belviq, Defendants failed to warn, advise, educate or otherwise inform Belviq users, prescribers or governmental regulators in the United States about the risk of cancer and the failure of Defendants to conduct proper tests. Indeed, at all times Plaintiff was prescribed, purchased, and ingested Belviq, the U.S. label did not contain any warning regarding the risk of cancer, nor the failure to conduct proper testing of the risks of cancer, despite information regarding these risks being available to

Defendants.

6.      Consequently, as a result of the foregoing acts, omissions, and wrongful conduct by Defendants, Plaintiff used Belviq, which caused her to develop Rectal Cancer, as well as other severe and personal injuries. As a proximate result of Defendants' negligent, reckless, grossly negligent and wrongful actions, inactions and/or conduct, Plaintiff was injured and suffered damages from the use of Belviq.  Plaintiff therefore demands judgment against Defendants and requests, among other things, compensatory damages, statutory damages, punitive damages, attorneys' fees, costs and all other available remedies and damages allowed by law.

**PARTY PLAINTIFF**

7.      Plaintiff, CLAUDIA HAYES, at all relevant times described herein, was and is a citizen of the United States of America, and is a resident of San Diego County, State of California.

8.      Plaintiff was born on May 8, 1947.

9.      Plaintiff was prescribed Belviq by her physician and first began using Belviq on or about March 2016, and continue to use Belviq through approximately October 2019.

10.      Plaintiff was given no warnings by her physicians about the serious risks of cancer posed by Belviq. Plaintiff was given no warning by Defendants of the risk of cancer or the failure of Defendants to conduct proper testing, before taking, while taking, and after discontinuing Belviq. Plaintiff's prescribing physicians were given no warnings by Defendants of the risk of cancer from taking Belviq, before or during the time that Plaintiff took Belviq.

11.      As result of her exposure to Belviq, Plaintiff was caused to suffer from Rectal Cancer. After years of being exposed to Belviq, in or about October 2019, Plaintiff suffered from blood in her stools, which led to medical treaters performing a colonoscopy and diagnosing her Rectal Cancer. As a result of her use of Belviq, Plaintiff was diagnosed on October 31, 2019 with Low Rectal Cancer, more specifically, Stage III3B Rectal Cancer.

12.      As result of her exposure to Belviq, Plaintiff was caused to sustain severe and permanent personal injuries, pain, suffering, and emotional distress.

13.     By reason of Defendants acts and omissions, Plaintiff was and still is caused to suffer from  rectal cancer, as well as other severe and personal injuries whichare  permanent  and  lasting  in nature,  physical  pain  and  mental  anguish,  including  diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

14.     Plaintiff has endured and continues to suffer the  mental anguish and psychological trauma of living with the knowledge that she has suffered serious and dangerous side effects from Belviq including, rectal cancer, as well as the mental and emotional fear of redeveloping cancer or any of the other above-named health consequences.

15.     The injuries and damages sustained by Plaintiff were caused by Defendants' actions and Defendants' Belviq.

16.     By reason of the foregoing, Plaintiff has been severely and permanently injured, and will require more constant and continuous medical monitoring and treatment than prior to Plaintiff's use of Defendants' Belviq drug.

17.     At all relevant times, Plaintiff purchased Belviq in the State of California, ingested Belviq in the State of California, and was injured by Belviq in the State of California.

## PARTY DEFENDANTS

**DEFENDNANT ARENA PHARMACEUTICALS, INC.**

18.     ARENA is a Delaware corporation with its principal place of business in California. At all relevant times herein, ARENA has had its principal place of business located at 6154 Nancy Ridge Drive, San Diego, California 92121.

19.     ARENA is involved in the research, manufacture, development, sales, and marketing of pharmaceutical products, including Belviq and lorcaserin hydrochloride.  At all relevant times herein, ARENA was in the business of and was involved in the researching, manufacturing, testing, advertising, promoting, marketing, selling, and distributing the drug Belviq.

20.     ARENA  purposefully  availed  itself  to  California  because  it  had  designed, manufactured,  tested,  sought  regulatory  approval  for,  and  together  with  co-defendant  EISAI

marketed, sold, and distributed Belviq, in California, including the pills taken by Plaintiff.  ARENA together with its co-defendants packaged, labeled, promoted, advertised, marketed, distributed, and sold Belviq in the State of California at all times Plaintiff was prescribed, purchased, and ingested Belviq.  Plaintiff's claims directly arise out of these forum-related activities by ARENA.  Plaintiff used this defective product in California, and Plaintiff had suffered and continues to suffer injuries in California.

**DEFENDANT EISAI, INC.**

21.     EISAI is a Delaware corporation with its principal place of business in New Jersey. Its principal place of business is located at 100 Tice Boulevard, Woodcliff Lake, New Jersey 07677.

22.     EISAI is involved in the research, development, sales, distribution, and marketing of pharmaceutical products, including Belviq and lorcaserin hydrochloride.  At all relevant times herein, EISAI was in the business of and did research, test, advertise, promote, market, sell, and distribute the drug Belviq.

23.     EISAI purposefully availed itself to California because it had marketed, co-marketed, sold, and distributed Belviq, in California, including the pills taken by Plaintiff.  EISAI together with its co-defendants packaged, labeled, promoted, advertised, marketed, distributed, and sold Belviq in the State of California at all times Plaintiff was prescribed, purchased, and ingested Belviq. Plaintiff's claims directly arise out of these forum-related activities by EISAI. Plaintiff used this defective product in California, and Plaintiff had suffered and continues to suffer injuries in California.

**DOE DEFENDANTS**

24.     Defendants Does 1 through 100, inclusive, are sued herein under fictitious names. Their true names and capacities, whether individual, corporate, associate or otherwise, are unknown to Plaintiffs.  Plaintiffs are informed and believe, and thereon allege, that each of the fictitiously named Defendants is responsible in some manner for the events and occurrences alleged herein and

that Plaintiffs' damages were proximately caused by those Defendants. Plaintiffs will amend this complaint to show their true names and capacities when the same have been ascertained. Each reference in the complaint to Defendant, a Defendant, or a specifically named Defendant refers to all named Defendants and those sued under fictitious names.

25. Plaintiffs are informed and believe, and based thereon allege, that at all times mentioned herein, each of the Defendants, including Defendant DOES 1 through 20, inclusive, and each of them, was the agent, servant, employee and/or representative of each of the remaining Defendants and was at all times material hereto acting within the authorized course and scope of said agency, service, employment and/or representation, and/or that all said acts, conduct, and omissions were subsequently ratified by the respective principles and the benefits thereof accepted by such principals.

## **JURISDICTION & VENUE**

26. Plaintiff, CLAUDIA HAYES, is a citizen of the United States of America, and is a resident of San Diego County, State of California.

27. Plaintiff was prescribed Belviq in the State of California, purchased Belviq in the State of California, ingested Belviq in the State of California, was injured by Belviq in the State of California, and was treated for injuries caused by Belviq in the State of California.

28. Likewise, ARENA at all relevant times herein has been "at home" in California due to its principal place of business being in San Diego, California.

29. ARENA researched, developed, tested, and sought initial approval from the United States Food & Drug Administration ("FDA") for Belviq at its San Diego, California location. ARENA researched, developed, and together with its co-defendants sold, and marketed Belviq and lorcaserin hydrochloride in California. ARENA communicated regularly with the FDA regarding Belviq from its San Diego, California location.

30. EISAI packaged, labeled, promoted, advertised, marketed, distributed, and sold Belviq in the State of California including to Plaintiff and her physician.

31.     Defendants conducted and/or sponsored numerous clinical trials regarding Belviq at numerous sites throughout the State of California. By way of example, the post-marketing CAMELLIA-TMI 61 multi-center clinical trial referenced hereinafter, included over thirty medical centers located throughout the State of California, including at several medical centers located in San Diego, California.

32.     Venue in this action properly lies in the Superior Court of California, San Diego County, in that Defendant ARENA at all relevant times herein maintains its principal place of business in San Diego County. In addition, Plaintiff is a resident of San Diego, California, and Belviq was distributed and sold to Plaintiff in California.

## FACTUAL BACKGROUND

**FDA Approval of Belviq in the United States**

33.     At all relevant times herein, Defendants were in the business of and did design, manufacture, sell, distribute and supply Belviq for chronic weight management.

34.     ARENA submitted the New Drug Application for Belviq to the FDA on or about December 18, 2009 requesting that the FDA grant it approval to market and sell Belviq, also known as lorcaserin hydrochloride, in the United States as an adjunct to a reduced-calorie diet and increased physical activity for chronic weight management in adult patients with a body mass index (hereinafter referred to as "BMI") greater than or equal to 30 kg/m$^2$ or adult patients with a BMI greater than or equal to 27 kg/m$^2$ and at least one weight-related comorbid condition.

35.     ARENA received FDA approval for Belviq on June 27, 2012 as an adjunct to reduced-calorie diet and increased physical activity for chronic weight management in adult patients with a body mass index (hereinafter referred to as "BMI") greater than or equal to 30 kg/m2 or adult patients with a BMI greater than or equal to 27 kg/m2 and at least one weight- related comorbid condition. The FDA's approval was conditioned upon and subject to the requirement of ARENA conducting certain post approval safety tests.

36.     Four years later, on July 15, 2016, ARENA received additional FDA approval for

7

1  Belviq XR, an extended-release tablet of lorcaserin hydrochloride, for the same indication as Belviq

2  (hereinafter Belviq and Belviq XR will be collectively referred to as "Belviq").

3

4  **Defendants Joint Agreements to Manufacturer, Market, and Distribute Belviq**

5     37.     ARENA and EISAI entered into the first Marketing and Supply Agreement in July

6  2010 and later in May 2012, ARENA and EISAI entered into a revised agreement, entitled "Amended

7  and Restated Marketing and Supply Agreement."

8     38.     Defendants entered into the Amended and Restated Marketing and Supply Agreement

9  to establish a collaboration to support Belviq's development, approval and commercialization. The

10 full terms of the agreement are within the custody and control of Defendants.

11    39.     ARENA and EISAI jointly launched Belviq in the United States in 2012, with

12 ARENA manufacturing Belviq and EISAI as the exclusive distributor.

13    40.     Following the FDA's approval of Belviq, ARENA announced on its website that its

14 then current strategy was to first focus its efforts on the commercialization of Belviq in North and

15 South America pursuant to the terms of the Amended and Restated Marketing and Supply Agreement

16 with EISAI.

17    41.     Following FDA approval, ARENA promoted the safety, efficacy and sale of Belviq

18 in the United States on its website, in press releases, through in-person presentations at conferences,

19 in the drug's label, in print materials, through websites associated with Belviq, such as

20 belviqnow.com, as well as other public outlets.

21    42.     At all relevant times, ARENA maintained responsibility with EISAI for the

22 commercialization, marketing,distribution and sale of Belviq in the United States.

23    43.     After ARENA received additional FDA approval for Belviq XR, ARENA and EISAI

24 entered into the Second Amended and Restated Marketing and Supply Agreement in November 2013

25 to account for both Belviq and Belviq XR. ARENA entered into the Second Amended and Restated

26 Marketing and Supply Agreement with EISAI to establish a collaboration  to support Belviq's

27 development, approval and commercialization. The full terms of the agreement are within the custody

28

1  and control of Defendants.

2      44.    Belviq XR was jointly launched by ARENA and EISAI in the United States in 2016,

3  with ARENA manufacturing Belviq XR and EISAI as the exclusive distributor.

4      45.    Following the FDA's approval of Belviq XR, Defendant ARENA promoted the

5  safety, efficacy and sale of Belviq XR in the United States on its website, in press releases, through

6  in-person presentations at conferences, in the drug'slabel, through the sales force, in print materials,

7  through websites associated with Belviq, such as belviqnow.com, as wellas other public outlets.

8      46.    On October 15, 2013, Arena issued a press release regarding Defendants' marketing

9  strategy titled: *Arena Pharmaceuticals Reports That Eisai Will Double BELVIQ® (lorcaserin HCl)*

10 *CIV Sales Force by December; Expansion to Approximately 400 Sales Specialists Follows Increased*

11 *Coverage of BELVIQ by Health Plans and Pharmacy Benefit Managers.* The press release reported

12 that EISAI (who is responsible for the marketing and distribution of Belviq under its agreement with

13 ARENA) is doubling the size of its sales force to approximately 400 sales representatives to reach

14 approximately 65,000 physicians and that it expects that the expansion of the Belviq sales force will

15 "help communicate the safety and efficacy of Belviq to an increased number of physicians."

16     47.    At all relevant times, ARENA PHARMACEUTICALS, INC. maintained

17 responsibility with Defendant EISAI for the commercialization, marketing, distribution and sale of

18 Belviq XR in the United States.

19     48.    In 2017, EISAI purchased the global rights to develop and market Belviq from

20 ARENA.  The full terms of the agreement are within the custody and control of Defendants.

21     49.    This purchase was the subject of a press release by EISAI CO., LTD in which it

22 announced that, in association with Defendant EISAI, it had reached an agreement with ARENA to

23 revise the previous marketing and supply agreement that it had concluded with ARENA's wholly-

24 owned subsidiary, ARENA PHARMACEUTICALS GmbH, and under the new agreement, EISAI

25 acquired rights to develop and market Belviq from both ARENA and ARENA

26 PHARMACEUTICALS GmbH. *See*: *https://www.eisai.com/news/news201701.html.*

27     50.    On January 4, 2017 ARENA issued its own press release announcing that ARENA

28

and EISAI amended the Marketing and Supply Agreement for Belviq globally. The ARENA press release states that "Our US operations are located in San Diego, California". The press release advised that under the revised agreement ARENA will continue to manufacture Belviq and that EISAI will control the global development and commercialization decisions. The financial terms reflected that Arena will receive multi-millions of dollars in cash payments and costs relief as well as remain eligible to receive multi-millions of dollars stemming from royalty payments from global sales of Belviq. The press release further stated that: "ARENA will continue to be eligible to receive royalty payments on net sales of BELVIQ and participate in the upside potential of lorcaserin from additional geographies and clinical trials such as the ongoing cardiovascular outcomes trial, CAMELLIA."     *https://invest.arenapharm.com/news-releases/news-release-details/arena-pharmaceuticals-and-eisai-amend-marketing-and-supply*

**Belviq's Pre-Clinical Rats Studies Showed Increased Cancer Risk**

51.     Belviq is a first-in-class oral selective serotonin 5HT2c receptor agonist and is available by prescription only in oral tablets at doses of 10mg taken twice daily or 20mg extended release taken once daily.

52.     During the preclinical trial program for Belviq, Defendants conducted a two-year carcinogenicity study in rats (hereinafter referred to as the "two-year carcinogenicity rat study") in which lorcaserin was identified as a non-genotoxic carcinogen that induced multiple tumor types; this identification was primarily due to an increase in mammary tumors found in both sexes near clinical exposure and at all doses in female rats.

53.     This same preclinical, two-year carcinogenicity rat study also revealed an increase in astrocytomas, malignant schwannomas, hepatocellular adenoma and carcinoma, skin subcutis fibroma, skin squamous carcinoma, and thyroid follicular cell adenoma in male rats. Adenocarcinoma diagnosed in the lorcaserin groups were associated with increased tumor onset, multiplicity, and lung metastases. Fibroadenoma in the lorcaserin groups also demonstrated greater incidence and multiplicity.

54.     While the two-year carcinogenicity rat study was ongoing, the FDA required bi-monthly updates from Defendants due to the consistently increased incidence of tumors and mortality that was being seen in the lorcaserin groups. However, in the final report of the study, Defendants reported that the incidence of adenocarcinoma was lower in the mid- and high-dose groups than that previously reported at week 96, and that it had increased in the control group. The final report also revealed that the incidence of fibroadenoma had increased across all doses from week 96, with notable variations in the mid- and high- dose groups. Due to the apparent increase in fibroadenoma accompanying the decrease in adenocarcinoma after week 96, the FDA suspected that study investigators had reclassified tumor types.

55.     Defendants attributed the increased incidence of tumors seen in the two-year carcinogenicity rat study to elevated prolactin levels induced by lorcaserin in rats, which they claim was a rodent-specific phenomenon.

56.     In addition to two-year carcinogenicity rat study, during the preclinical trial program, Defendants also conducted a two-year carcinogenicity study in mice (hereinafter referred to as the "two- year carcinogenicity mouse study"), which demonstrated an increase in malignant hepatocellular carcinoma in males and schwannoma in females. Although the dosing levels were below the clinical dose, these findings provide further context and support for the potential carcinogenicity of lorcaserin, particularly in combination with the results of the two-year carcinogenicity rat study.

57.     The two-year carcinogenicity rat study, the two-year carcinogenicity mouse study and/or a combination of both, put Defendants on notice and/or should have put Defendants on notice that lorcaserin was a carcinogen and/or that further testing needed to be done, testing that would have confirmed lorcaserin as a carcinogen and an unreasonably dangerous product.

**Belviq's Pre-Approval Clinical Trial Data**

58.     In addition to the aforementioned studies, from September 2006 through February 2009, Defendants conducted the Behavioral modification and Lorcaserin for Overweight and Obesity

11

Management (BLOOM) trial – a two-year, randomized, placebo-controlled, double-blind, multicenter clinical trial involving 3,182 patients – to examine the efficacy of lorcaserin in reducing body weight in the United States. While weight reduction was seen in the first year, all treatment groups experienced weight regain during the second year. In July 2010, the results of the BLOOM trial were published in the New England Journal of Medicine (hereinafter referred to as "NEJM"). Smith S.R., et al. Multicenter, Placebo- Controlled Trial of Lorcaserin for Weight Management. N. Engl. J. Med 2010;363:245-56.

59.    Additionally, from December 2007 to July 2009, Defendants conducted the Behavioral modification and Lorcaserin Second Study for Obesity Management (BLOSSOM) trial – a one-year randomized, placebo-controlled, double-blind, parallel arm trial involving 4,008 patients – to examine the effects of lorcaserin on body weight, cardiovascular risk, and safety in the United States. In July 2011, the results of the BLOSSOM trial were published in the Journal of Clinical Endocrinology and Metabolism. Fidler, M.C., et al. A One-Year Randomized Trial of Lorcaserin for Weight Loss in Obese and Overweight Adults: the BLOSSOM trial. J Clin Endocrinol Metab 2011;96:3067-3077.

60.    Combined data from the BLOOM and BLOSSOM trials demonstrated only a 3.3% mean weight loss after one year with lorcaserin over that of the placebo group, demonstrating that lorcaserin failed to meet the mean efficacy criterion of FDA's obesity draft guidance.

**FDA's Initial Rejection of Belviq Because of Cancer Concerns**

61.    On December 18, 2009, Defendant ARENA submitted its first New Drug Application for Belviq seeking to market and distribute Belviq in the United States.

62.    On September 16, 2010, the Endocrinologic and Metabolic Drugs Advisory Committee (hereinafter referred to as "EMDAC") met to discuss approval of Belviq based on the results of preclinical trials and the BLOOM and BLOSSOM Phase 3 clinical trials. The EMDAC panel voted nine (9) to five (5) against approval of Belviq as the potential benefits did not outweigh the potential risks based on concerns about the preclinical carcinogenicity findings (i.e., increased

mammary adenocarcinoma/fibroadenoma and brain astrocytomas in rats) and marginal weight loss demonstrated by the clinical trials.

63.     On October 28, 2010, the FDA issued a Complete Response Letter (CRL) rejecting approval of Belviq. The bases for the CRL included uncertainty in diagnosis of mammary masses in rats, unresolved issues with the exposure-response relationship between lorcaserin and mammary adenocarcinoma, failure to identify a mode of action and a clear safety margin for brain astrocytoma, and marginal weight loss results.

64.     In response to the CRL, Defendants convened a pathology working group (hereinafter referred to as "PWG") to blindly re-adjudicate the preclinical mammary tumor data in rats.

65.     The CRL also requested that Defendants submit the final report from the third Phase 3 trial in overweight and obese patients with Type 2 Diabetes Mellitus.

66.     From December 2007 to August 2010, Defendants conducted the Behavioral modification and Lorcaserin for Obesity and Overweight Management in Diabetes Mellitus (BLOOM-DM) trial – a one- year, randomized, placebo-controlled trial involving 604 patients – to examine the efficacy and safety of lorcaserin for weight loss in patients with Type 2 Diabetes Mellitus in the United States. After one year, there was only a 3.1% mean weight loss with lorcaserin over that of the placebo group. In April 2012, the results of the BLOOM-DM trial were published in the journal of The Obesity Society. O'Neil, P.M., et al. Randomized Placebo-Controlled Clinical Trial of Lorcaserin for Weight Loss in Type 2 Diabetes Mellitus: The BLOOM-DM Study. Obesity 2012;20:1426-1436.

67.     On December 27, 2011, in response to the CRL, Defendants submitted to the FDA the final report of the BLOOM-DM study and data from the PWG readjudication, as well as new studies Defendants claimed supported their continued assertion that the increase in tumors seen in the two-year carcinogenicity rat study was due to elevated prolactin levels induced by lorcaserin, again claiming it was a rodent-specific phenomenon.

68.     As to the PWG re-adjudication, the PWG found a decreased number of adenocarcinoma and an increased number of fibroadenoma in both the control and the lorcaserin

groups, which they claim was a rodent-specific phenomenon.

69.     As to the PWG re-adjudication, for adenocarcinoma, the number decreased to a larger extent in the lorcaserin group compared to the control group, but lorcaserin still increased the incidence, tumor onset and multiplicity, and lethality of mammary adenocarcinoma, and the high-dose lorcaserin group maintained a statistically significant increase in adenocarcinomas compared to the control group. Regarding fibroadenoma, there was an increase in the incidence, tumor onset and multiplicity, and lethality across all lorcaserin dose groups compared to the control group; yet despite their relevance, these results were disregarded as irrelevant to risk of carcinoma in FDA's review of the readjudication data.

70.     Upon information and belief, the PWG re-adjudication procedure and its results were mis-adjudicated, misapplied, misinterpreted and/or otherwise skewed in favor of Defendants and, particularly, a finding that lorcaserin was not a carcinogen; nevertheless, even if accepted as true, the results of the PWG re-adjudication, reviewed separately and/or in combination with the initial results of the two-year carcinogenicity rat study, the two-year carcinogenicity mouse study and/or both, put Defendants on notice or should have put Defendants on notice that lorcaserin was a carcinogen and/or that further testing needed to be done, testing that would have confirmed lorcaserin as a carcinogen.

71.     On May 10, 2012, a second EMDAC panel met to discuss approval of Belviq with a focus on the PWG readjudication of preclinical data to determine the drug's potential carcinogenicity risk, to determine a safety margin for astrocytoma by looking at lorcaserin levels in human cerebrospinal fluid, and to discuss the results of the BLOOM-DM Phase 3 clinical trial to further determine efficacy. The panel voted 18 to four (4) (with one abstention) that the benefits of Belviq outweighed the risks for an overweight and obese population. The panel also recommended a post-approval assessment of risk for Belviq, with a focus on cardiovascular risk. Ultimately, the FDA required that Defendants conduct six (6) post-marketing studies, including a cardiovascular outcomes trial.

72.     On June 26, 2012, in his Summary Review of Defendants' application for approval following submission of data in response to the CRL, the FDA Deputy Division Director, Dr. Eric

Colman, indicated that the PWG's analysis addressed the concerns raised by the data in the original application, and that he did not believe Belviq posed a risk for mammary adenocarcinoma in humans. He also stated that the cerebrospinal fluid data provided an adequate safety margin for brain astrocytoma. However, regarding tumorigenic mechanism of action, Dr. Colman noted that the FDA Pharmacology/Toxicology reviewer, Dr. Fred Alavi, concluded that the prolactin studies, while supportive of a plausible role of prolactin in tumor formation, fell short of definitive proof that elevated prolactin levels were the reason increased tumors were seen during the two-year carcinogenicity rat study.

**Defendants Withdrew Belviq from European Review Process**

73.     In stark contrast to the FDA's approval of Belviq despite the aforementioned testing, results and findings, on May 3, 2013, Defendants withdrew the application for marketing authorization for Belviq with the European Medicines Agency (hereinafter referred to as "EMA").

74.     In reviewing the data submitted by Defendants, the EMA Committee for Medicinal Products for Human Use (hereinafter referred to as "CHMP") determined that Belviq was not approvable due to major objections regarding carcinogenicity and efficacy. Specifically, the CHMP found that, even with the PWG re-adjudication, the risk of carcinogenicity in humans needed further consideration and the overall clinical risk/benefit balance was negative in that the modest efficacy results did not outweigh safety concerns. The CHMP further stated that the increased occurrence of several tumor types in male rats was particularly concerning due to the lack of any persuasive mechanism of action that would provide assurance of safety in human use, which also undermined any discussion on exposure margins. Thus, the CHMP concluded that the clinical relevance of the tumors found in the two-year carcinogenicity rat study must be evaluated as part of the risk-benefit assessment.

**Post-Marketing Clinical Trial Data Shows Increased Cancer Risk**

75.     From January 2014 to June 2018, Defendants conducted a post-marketing trial of lorcaserin - the Cardiovascular and Metabolic Effects of Lorcaserin in Overweight and Obese Patients – Thrombolysis in Myocardial Infarction 61 (CAMELLIA-TIMI 61).

76.     CAMELLIA-TIMI 61 was a randomized, double-blind, placebo-controlled, multicenter, parallel group clinical trial involving 12,000 patients conducted in the United States, Canada, Mexico, the Bahamas, Europe, South America, Australia, and New Zealand to evaluate the risk of heart-related issues with Belviq. The primary safety outcome of major adverse cardiovascular events showed noninferiority. The results of CAMELLIA-TIMI 61 were published in September 2018 in NEJM. Bohula, E.A., et al. Cardiovascular Safety of Lorcaserin in Overweight or Obese Patients. N. Engl. J. Med. 2018;379:1107-17.

**FDA Recalls Belviq**

77.     On January 14, 2020, the FDA issued a safety communication regarding clinical trial results showing a plausible increased risk of cancer with Belviq. The FDA stated that its evaluation of the potential signal was ongoing, and a causal association was at that time uncertain.

78.     On February 13, 2020, the FDA announced that EISAI had submitted a request to voluntarily withdraw Belviq from the market. The FDA reported that analysis of the CAMELLIA-TIMI 61 data indicated an imbalance of cancer in patients taking Belviq that increased with treatment duration, including pancreatic, colorectal, and lung cancer. Specifically, one additional cancer was observed per 470 patients treated for one year, with 462 (7.7%) Belviq patients diagnosed with 520 primary cancers compared to 423 (7.1%) with 470 cancers in the placebo group. The FDA further stated that the risks of Belviq outweigh its benefits and recommended that patients stop taking Belviq and dispose of any unused pills. The FDA also instructed all health care professionals to stop prescribing Belviq and to contact their patients taking Belviq to inform them of the increased risk of cancer and ask that they stop taking Belviq.

**New England Journal of Medicine Peer Reviewed Article about the Dangers of Belviq**

79.     In the September 10, 2020 issue of the New England Journal of Medicine the FDA submitted an article entitled: "**Cancer Risk Associated with Lorcaserin — The FDA's Review of the CAMELLIA-TIMI 61 Trial**".

80.     The article makes clear that the FDA's decision to request the voluntary recall of the oral weight-loss drug lorcaserin (Belviq, Belviq XR) came after a careful analysis by the FDA (<u>not by the Defendants</u>) of the postmarketing safety data that revealed excess cancer risk and death.

81.     The FDA authors stated, in part, as follows:

> On February 13, 2020, the Food and Drug Administration (FDA) announced that it had requested that the manufacturer of Belviq and Belviq XR (lorcaserin and extended-release lorcaserin) voluntarily withdraw the products from the U.S. market. The agency's request was based on its assessment of lorcaserin's benefits and risks after a review of a large postmarketing clinical trial that revealed a higher frequency of cancer diagnosis in the lorcaserin group than in the placebo group…

> *The FDA did not approve the original marketing application for lorcaserin, submitted in December 2009, in part because nonclinical carcinogenicity studies revealed an increased incidence of several tumor types in rats exposed to the drug… As a condition of approval, the FDA required Arena to conduct a postmarketing study focused on cardiovascular safety…*

> The randomized placebo-controlled CAMELLIA-TIMI 61 trial, conducted from 2014 through 2018, evaluated lorcaserin's effect on the incidence of major adverse cardiovascular events (MACE) in 12,000 patients randomly assigned to lorcaserin or placebo in a 1:1 ratio…

> *The published report identified no safety signal related to cancer. The FDA's initial safety analyses of the CAMELLIA study report identified a potential signal of increased cancers and cancer-related mortality. In contrast to the published study, when assessing cancer incidence, the FDA considered all postrandomization adverse events, not just "on treatment" events (those that occurred within 30 days after drug discontinuation)…*

> *The cancer-related safety signal from nonclinical studies supports the plausibility of an excess cancer risk from lorcaserin, and the consistency of cancer findings in CAMELLIA-TIMI 61 and the robustness of sensitivity analyses further support a causative effect. The increased risk of various cancer types associated with lorcaserin in the clinical study reflects the pattern seen in nonclinical studies…*

> Balancing the clinical importance of cancer and the difficulty of mitigating this risk against the uncertain clinical benefit of lorcaserin, however, we conclude that the

therapy's benefits do not outweigh the risks for any identifiable patient population.

N. Engl. J. Med. 2020; 383:1000-1002. (*emphasis* provided)

82.     In their clinical trials, Defendants limited their safety data and reports to only patients that were diagnosed with cancer within a month of discontinuing the medication and excluded in their analyses other patients who developed cancer after they stopped taking the pill.

83.     Cancer can take years to develop but can be caused by previous exposure to a carcinogen.

84.     In contrast to the Defendants' improper and limited view, when assessing the cancer incidence of Belviq, the FDA considered all reported adverse events, not just "on treatment" events (those that occurred within 30 days after drug discontinuation).

85.     The FDA (not the Defendants) did its own safety data analysis of the clinical trial data,  as well as the adverse events reported as to cancer and determined that the drug causes an excess risk cancer.

86.     After which the FDA recalled the drug from the market.

**Belviq is an Unreasonably Dangerous Drug with Inadequate Warnings**

87.     The aforementioned facts support that Belviq is not an effective drug to use as an adjunct to a reduced-calorie diet and increased physical activity for chronic weight management in adults with certain initial BMI.

88.     The aforementioned facts support that Belviq is not a safe drug to use as an adjunct to a reduced-calorie diet and increased physical activity for chronic weight management in adults with certain initial BMI.

89.     The aforementioned facts support that Belviq is associated with an increased risk of cancer.

90.     The aforementioned facts support that the efficacy of Belviq is not outweighed by its safety risks, particularly its increased risk of cancer.

91.     The aforementioned facts support that Belviq was not sufficiently and/or adequately

tested for safety by Defendants.

92.     Prior to applying for and obtaining approval of Belviq, Defendants knew or should have known that human consumption of Belviq was associated with and/or would cause the induction of cancer, and Defendants possessed pre-clinical scientific studies, which Defendants knew or should have known were a signal that Belviq could cause cancer and/or the cancer risk needed further testing and studies prior to its introduction to the market.

93.     Upon information and belief, despite cancer findings in animal carcinogenicity studies, Defendants failed to adequately conduct complete and proper testing of Belviq prior to filing their New Drug Application for Belviq.

94.     From the date Defendants received FDA approval to market Belviq, Defendants manufactured, distributed, marketed, and sold Belviq without adequate warning to Plaintiff's prescribing healthcare provider or to Plaintiff that Belviq was associated with and/or could cause cancer, presented a risk of cancer in patients who used it, and that Defendants had not adequately conducted complete and proper testing and studies of Belviq with regard to carcinogenicity.

95.     Upon information and belief, Defendants ignored the association between the use of Belviq and the risk of developing cancer.

96.     Defendants failed to adequately warn plaintiff and her physicians of the plausible increased risk of cancer in Belviq seen in the nonclinical trials.

97.     Defendants further failed to adequately warn plaintiff and her physicians of their failure to conduct adequate tests and analyses of the cancer risks of Belviq.

98.     Defendants failed to design and conduct adequate tests, studies, and analyses for the cancer risk of Belviq.

99.      Defendants failed to adequately monitor and analyze the safety data and adverse events for the cancer risk of Belviq.

100.     Defendants' failure to disclose information that they possessed regarding the failure to adequately test and study Belviq for cancer risk   further which rendered warnings for this medication inadequate.

**Defendants Acted in Conscious Disregard of Safety**

101.    Defendants' conduct as alleged herein was grossly negligent and done with reckless disregard for human life. Defendants' conduct as alleged herein was done with malice.  Defendants acted with oppression, fraud or malice and their actions were carried on with a willful and conscious disregard of the safety of others, including to Plaintiff.

102.    Defendants acted with conscious disregard for the safety of the patients, including Plaintiff, because Defendants were aware of the plausible dangerous consequences of Belviq increasing the risk of cancer and failed to avoid these consequences or even warn of the increased risk.

103.    Defendants knew of the probability of the increased risk of cancer from taking Belviq from its own previous testing and animal studies. Defendants could have made inexpensive design changes, including adding a warning in the product labeling, but instead deferred and denied this corrective actions in conscious disregard for the safety of the patients, including Plaintiff.

104.    Defendants also acted with conscious disregard for the safety of the patients, including Plaintiff, because Defendants failed to adequately test Belviq.  Adequate testing would have revealed an association between Belviq and cancer.  Defendants testing on Belviq was inadequate and Defendants' decision not to do any further testing even after being on notice of this plausible increase cancer risk and dangerous propensities shows they acted with conscious disregard for the safety of the patients, including Plaintiff.  Defendants' failure to adequately test its product before marketing it or during marketing is confirmation that the defendants acted with conscious disregard for safety.

105.    Defendants further acted with conscious disregard for the safety of the patients, including Plaintiff, because Defendants failed to adequately monitor the safety reports of Belviq and take corrective action, including updating the label to warn of the increased risk of cancer. Defendants were aware of the increased risk of cancer from the preclinical animal studies and yet never adequately made or monitored a safety signal to properly monitor for cancer in the adverse event reporting. Additionally, upon information and belief Defendants were aware of adverse events reported to the company from patients and prescribing physicians and yet did practically nothing

after receiving these reports. Defendants' failure to warn patients and prescribing physicians of the increased risk of cancer.

106.     Defendants were fully aware of the safety risks of Belviq dating back to their preclinical and clinical trials. Nonetheless, Defendants deliberately crafted their label, marketing and promotion to mislead consumers and their physicians on these serious and permanent life-altering injuries.

107.     This conduct by the Defendants was not done by accident. Rather, Defendants knew that they could turn a profit by convincing physicians and consumers that Belviq was safe and came without any serious harmful risks. Defendants further knew that full disclosure of the true risks of Belviq would limit the amount of money it would make selling the drug. Defendants' object was accomplished not only through inadequate warnings in their label, but through a comprehensive scheme of continuing to promote the safety of Belviq while simultaneously failing to timely and adequately test, analyze, and report of the excess cancer risk.

108.     Plaintiff's physician and Plaintiff were denied the opportunity and the right to have a discussion in order to make an informed decision about whether to prescribe and take Belviq. Defendants accomplished this by failing to provide them with adequate information about the serious risks of cancer from Belviq. Such conduct was done with conscious disregard of Plaintiff's rights.

109.      Defendants failed to timely and adequately perform a careful analysis of the post marketing safety data that would have revealed an excess cancer risk and deaths as well as to timely and adequately warn of this dangerous risk.

110.     Defendants were on notice of the plausible increased risk of cancer seen in the nonclinical studies.  A proper and careful review of all the adverse events (including the adverse events from clinical trials) would have reflected the cancer pattern seen in the nonclinical trials.

111.     Defendants recklessly failed to do so and their wrongful actions and inactions are a stark departure from those of a reasonably prudent manufacturer/distributor of prescription drugs.

112.     Defendants' conduct was reckless and malicious and reflects a conscious disregard of the health and safety of others, including the plaintiff.

113.     Accordingly, Plaintiff requests punitive damages against Defendants for the harms caused to Plaintiff.

## FIRST CAUSE OF ACTION
## AS AGAINST ALL DEFENDANTS
## (NEGLIGENCE)

114.     Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

115.     Defendants manufactured, distributed, and sold Belviq.

116.     Defendants had a duty to use reasonable care, which is the care that a reasonably careful designer, manufacturer, seller, distributor or supplier of prescription drugs would use under like circumstances.

117.     Reasonable care on the part of Defendants required that they give appropriate warnings about particular risks of Belviq which Defendants knew or should have known were involved in the reasonably foreseeable use of Belviq.

118.     Reasonable care on the part of Defendants required that they design and perform adequate and timely testing, studies, and analysis on their prescription drug, Belviq, including testing and studies for particular risks of Belviq, which Defendants knew or should have known were involved in the reasonably foreseeable use of Belviq.

119.     Reasonable care on the part of Defendants required that they properly and adequately monitor the safety data, including adverse events reported on their prescription drug, Belviq for particular risks of Belviq which Defendants knew or should have known were involved in the reasonably foreseeable use of Belviq.

120.     Reasonable care on the part of Defendants required that they adequately warn of all safety risks, including the plausibility of and/or the increased risk of cancer.

121.     Reasonable care on the part of Defendants required that they adequately warn of the Defendants failure to conduct adequate tests and studies the plausibility of and/or the increased risk

1    of cancer.

2        122.    Plaintiff used Belviq as intended for weight loss management.

3        123.    Defendants knew or should have known that Belviq could cause cancer.

4        124.    Specifically, as stated above, two preclinical studies, the two-year carcinogenicity rat

5    study and the two-year carcinogenicity mouse study demonstrated Belviq's propensity to cause

6    cancer.

7        125.    The two-year carcinogenicity rat study, the two-year carcinogenicity mouse study

8    and/or a combination of both, put Defendants on notice and/or should have put Defendants on notice

9    that lorcaserin was a carcinogen.

10       126.    At the very least, these preclinical carcinogenicity studies should have put Defendants

11   on notice that further testing needed to be done, testing that would have confirmed lorcaserin as a

12   carcinogen.

13       127.    The animal studies, combined with the marginal benefit seen in the clinical studies,

14   was enough to place Defendants on notice of the foreseeable risk of cancer. Indeed, this same

15   evidence led the EDMAC panel to initially vote against approval of Belviq on September 16, 2010

16   and which led the EMA to determine that Belviq was not approvable due to major objections

17   regarding carcinogenicity and efficacy.

18       128.    Under these circumstances, a reasonably careful and prudent designer, manufacturer,

19   seller, distributor or supplier of prescription drugs would have provided adequate warnings to

20   prescribing physicians and/or their patients that Belviq could cause cancer, that preclinical studies

21   found cancer in rats and mice and that adequate testing had not been performed to confirm Belviq's

22   cancer propensity.

23       129.    Despite the fact that Defendants knew or should have known that Belviq caused

24   cancer, Defendants sold Belviq to Plaintiff and/or her prescribing physician without properly alerting

25   physicians and their patients, including Plaintiff and her prescribing physician, of the cancer risk.

26       130.    Defendants knew or should have known that consumers such as the Plaintiff would

27   foreseeably suffer injury as a result of their failure to exercise ordinary care by warning about the

28

risk of cancer or warning that Belviq had not been adequately tested.

131.    Defendants had a duty to warn Plaintiff's prescribing physicians of all safety risks associated with Belviq, including its increased risk of causing cancer.

132.    Defendants had a duty to warn Plaintiff and her prescribing physicians that Belviq had not been adequately and/or sufficiently tested regarding its carcinogenicity.

133.    Defendants breached their duties to Plaintiff by failing to exercise reasonable care in warning her and her prescribing physician about the risk of cancer.

134.    As a result of the acts and omissions of Defendants, neither the Plaintiff, nor her physicians could have discovered, through the exercise of reasonable due diligence, that exposure to Belviq was associated with increased risks of cancer.

135.    Upon information and belief, had Plaintiff's prescribing physicians been warned of the increased cancer risk associated with Belviq, Belviq would not have been prescribed to Plaintiff and/or the prescribing physician would have relayed the risk of cancer to Plaintiff to allow her to make an informed decision regarding her use of Belviq and/or they would have instructed Plaintiff and her physician to closely monitor the patient to ensure early cancer detection.

136.    Upon information and belief, had Plaintiff's prescribing physicians been warned of the increased cancer risk associated with Belviq, he would not have prescribed Belviq to Plaintiff or he would have provided Plaintiff with adequate warnings regarding the dangers of Belviq.

137.    Had Plaintiff's physician warned her that Belviq can cause cancer, that it had not been adequately tested or that she would need to be monitored closely for cancer, she would not have used Belviq.

138.    Defendants' negligence in failure to warn Plaintiff and/or her prescribing physician of the risk of cancer as well as Defendants' failure to adequately test and monitor the safety data of Belviq were substantial factors in causing Plaintiff's use of Belviq and her subsequent Rectal Cancer diagnosis.

139.    Subsequent clinical studies conducted from January 2014 to June 2018 confirmed that Belviq causes cancer, including Rectal Cancer.  These findings led to FDA action and ultimately

Defendants decided to voluntarily withdraw Belviq from the market on or about February 13, 2020. This was too little, too late for Plaintiff.

140.    Defendants knew or reasonably should have known that Belviq was dangerous or was likely to be dangerous when used because it caused an excess risk of cancer. Defendants knew or reasonably should have known that users would not realize the danger because Defendants never adequately warned of the excess risk of cancer in Belviq's label.

141.    Defendants failed to adequately warn of the excess risk and danger of cancer in the Belviq's label. Defendants were negligent by not using reasonable care to warn or instruct about the Belviq's dangerous condition or about facts that made the Belviq likely to be dangerous, including the risk of cancer.

142.    A reasonable manufacturer/distributor/seller under the same or similar circumstances would have warned of the excess risk and danger of cancer in its product's label.

143.    Plaintiff was harmed by Belviq.  Plaintiff suffered serious personal injuries, including rectal cancer. Defendants' failure to warn was a substantial factor in causing Plaintiff's harm.

144.    Defendants never warned of the increased risk of cancer from taking Belviq to either the patients, including Plaintiff or their prescribing physicians. Defendants had a continuing duty to warn patients and physicians as long as the product was in use and constantly failed this duty for as long as the drug was on the market.

145.    Defendants were negligent in their failure to warn of the excess risks of cancer, as well as in the design, testing, and safety monitoring of Belviq.

146.    At all relevant times and at the time Belviq left the Defendants' control, and before March 2016, Defendants knew or should have known that Belviq was not safe for human consumption because it caused unreasonably dangerous side effects, including the excess risk of cancer.

147.    At all relevant times and at the time Belviq left the Defendants' control, Defendants knew or should have known that the safety risks of Belviq (i.e. its carcinogenicity) outweighed any benefits Belviq may have.

148.     Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, sale, and/or distribution of Belviq into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects, such as cancer.

149.     Defendants had a duty to warn Plaintiff and her prescribing healthcare provider, of all safety risks associated with Belviq, including its increased risk of causing cancer.

150.     Defendants had a duty to warn Plaintiff and her prescribing healthcare provider, that Belviq had not been adequately and/or sufficiently tested regarding its carcinogenicity.

151.     Defendants had a duty to adequately and sufficiently test Belviq.

152.     Defendants had a duty to design Belviq in a manner that was safe to its users.

153.     Defendants breached their duties to Plaintiffs by failing to exercise ordinary care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Belviq into interstate commerce in that Defendants knew or should have known that using Belviq created an increased risk of unreasonable, dangerous side effects, including cancer.

154.     Defendants under-reported, underestimated and downplayed the serious dangers of Belviq.

155.     Defendants' inadequate warnings, testing, and safety monitoring of Belviq were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

156.     By reason of the foregoing acts and omissions, the Plaintiff was caused to suffer from Rectal Cancer, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

157.     By reason of the foregoing, Plaintiff has been seriously and permanently damaged as a result of Defendant's conduct as described herein.

158.     Defendants' inadequate warnings, testing, and safety monitoring of Belviq were acts that amount to willful, wanton, and/or reckless conduct by Defendants that demonstrated a conscious disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff.

**SECOND CAUSE OF ACTION**
**AS AGAINST ALL DEFENDANTS**
**STRICT LIABILITY – FAILURE TO WARN**

159.     Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

160.     Defendants manufactured, distributed, and sold Belviq.

161.     A product is defective when the foreseeable risks of harm from the product could have been reduced or avoided by providing reasonable instructions or warnings, and the failure to provide those instructions or warnings makes the product unreasonably dangerous.

162.     Under California law, a product is defective if unreasonably dangerous even though the seller has exercised all possible care in the preparation and sale of the product. (*See* Judicial Council of California Civil Jury Instructions, 1201, et seq.)

163.     The risk of cancer, including the risk of Rectal Cancer, was a foreseeable risk that could have been avoided had Defendants provided reasonable instructions or warnings.

164.     Specifically, based on the two-year carcinogenicity rat study, and the two-year carcinogenicity mouse study described above, it was known or should have been known by Eisai and Arena that Belviq had a propensity to cause cancer.

165.     At the very least, the above-referenced preclinical studies put Defendants on notice of the need to perform adequate testing to confirm the cancer risk.

166.     The animal studies, combined with the marginal benefit seen in the clinical studies, was enough to place Defendants on notice of the foreseeable risk of cancer.  Indeed, this same evidence led the EDMAC panel to initially vote against approval of Belviq on September 16, 2010 and led the EMA to determine that Belviq was not approvable due to its cancer risk and marginal efficacy.

167.     Moreover, this same evidence led the EMA to determine that Belviq was not approvable due to major objections regarding carcinogenicity and efficacy.

168.     Subsequent clinical studies conducted from January 2014 to June 2018 confirmed that Belviq causes cancer, including Rectal Cancer.   These findings led to FDA action and ultimately

Defendants decided to voluntarily withdraw Belviq from the market on or about February 13, 2020. This was too little, too late for Plaintiff.

169. Defendants failed to warn Plaintiff and her prescribing physician that Belviq could cause cancer, that careful monitoring after using Belviq was needed for early cancer detection or that it had not been adequately tested.

170. Upon information and belief, had Plaintiff's prescribing physicians been warned of the increased cancer risk associated with Belviq, Belviq would not have been prescribed to Plaintiff and/or the prescribing physician would have relayed the risk of cancer to Plaintiff to allow her to make an informed decision regarding her use of Belviq and/or they would have instructed Plaintiff and her physician to closely monitor the patient to ensure early cancer detection.

171. Upon information and belief, had Plaintiff's prescribing physicians been warned of the increased cancer risk associated with Belviq, he would not have prescribed Belviq to Plaintiff or he would have provided Plaintiff with adequate warnings regarding the dangers of Belviq.

172. Had Plaintiff's physician warned her that Belviq can cause cancer, that it had not been adequately tested or that she would need to be monitored closely for cancer, she would not have used Belviq.

173. Had Plaintiff been warned that Belviq had not been sufficiently and/or adequately tested for safety risks, including cancer, she would not have used Belviq and/or suffered cancer.

174. Upon information and belief, had Plaintiff's prescribing physicians been warned that Belviq had not been sufficiently and/or adequately tested for safety risks, including cancer, he would not have prescribed Belviq to Plaintiff or he would have provided Plaintiff with adequate warnings regarding the dangers of Belviq and the inadequate safety data and she would not have used Belviq and/or suffered cancer.

175. Defendants' failure to warn Plaintiff and/or her prescribing physician of the risk of cancer was the proximate cause of Plaintiff's use of Belviq and her subsequent Rectal Cancer diagnosis.

176. Defendants' inadequate warnings of Belviq were acts that amount to willful, wanton,

and/or reckless conduct by Defendants that demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff.

177.    As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects including Rectal Cancer more specifically, Stage IIIB Rectal Cancer, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

178.    By reason of the foregoing, Defendants are strictly liable in tort to the Plaintiff for failing to provide adequate warnings concerning the cancer risk which made Belviq unreasonably dangerous.

179.    By reason of the foregoing, Plaintiff has been damaged as a result of Defendant's conduct as described herein.

180.    Belviq had the potential risk of causing cancer and this was known or knowable in light of the nonclinical study findings as well as the safety data and adverse events reported at the time of manufacture, distribution, and sale of Belviq to Plaintiff from approximately March 2016 through October 2019.

181.    Belviq lacked sufficient warnings regarding the potential risk of cancer.

182.    The potential and serious life-threatening risks of cancer presented a substantial danger when the Belviq is used.

183.    Ordinary consumers would not have recognized the potential risks of cancer because Defendants never warned of it.

184.    Defendants failed to adequately warn of the potential risks of cancer in the product label or whenever their sales and marketing personnel met with prescribing physicians.

185.    Plaintiff was harmed by Belviq.  Plaintiff suffered serious personal injuries, including rectal cancer.

186.    The lack of sufficient warnings was a substantial factor in causing Plaintiff's harm.

187.    Defendants failed to properly warn of the increased risk of cancer to the patients as well as the patients prescribing physicians.

188.    Defendants had a continuing duty to warn patients and physicians as long as the product was in use and constantly failed this duty for as long as the drug was on the market.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against the Defendants on each of the above-referenced claims and Causes of Action and as follows:

1.  Awarding compensatory damages to Plaintiff for past and future damages, including but not limited to pain and suffering for severe and permanent personal injuries sustained by the Plaintiff, CLAUDIA HAYES health care costs, medical monitoring, together with interest and costs as provided by law;

2.  Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete and conscious disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

3.  Awarding Plaintiff reasonable attorneys' fees;

4.  Awarding Plaintiff the costs of these proceedings; and

5.  Such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury as to all issues.

Respectfully submitted,

Dated: January  14, 2022                   By: /s/Nicholas J. Drakulich

Nicholas J. Drakulich (SBN: 98135)
Robert J. Drakulich (SBN: 281575)
**THE DRAKULICH FIRM, APLC**
2727 Camino Del Rio S., Suite 322

San Diego, CA 92018
Tel: (858) 755-6887
Fax: (858) 755-6456
njd@draklaw.com
rjd@draklaw.com

Daniel J. Thornburgh (PHV Applicant)
Nathan Bess (PHV Applicant)
**AYLSOCK, WITKIN, KREIS &
OVERHOLTZ, PLLC**
17 E. Main Street, Suite 200
Pensacola, FL 32502
Tel: (850) 202-1010
Fax: (850) 916-7449
dthornburgh@awko.com
nbess@awko.com

*Attorneys for Plaintiff*

# SUMMONS AND AMENDED COMPLAINT

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

<table>
<tr><td></td><td><i>FOR COURT USE ONLY<br>(SOLO PARA USO DE LA CORTE)</i></td></tr>
</table>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

EISAI, INC., ARENA PHARMACEUTICALS, INC., and DOES 1- 100, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

CLAUDIA HAYES

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego
**01/14/2022** at 04:40:40 PM
Clerk of the Superior Court
By Vanessa Sezenol,Deputy Clerk

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO<br>330 West Broadway, San Diego, CA 92101 | CASE NUMBER: *(Número del Caso):*<br>37-2022-00001812-CU-PL-CTL |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Nicholas J. Drakulich, THE DRAKULICH FIRM, APLC, 2727 Camino del Rio S., Ste. 322, San Diego, CA 92108, 858-755-5887

| DATE:<br>*(Fecha)* 01/18/2022 | Clerk, by<br>*(Secretario)* *Van Serol*<br>V. Sezenol | , Deputy<br>*(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario  Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)       ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>*www.courts.ca.gov* |
|---|---|---|

orivacy, please press the Clear This Form button after yo    [Print this form]   [Save this form]   [Clear this form]

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**01/28/2022** at 04:16:00 PM

Clerk of the Superior Court
By Melissa Valdez,Deputy Clerk

1  Nicholas J. Drakulich (SBN: 98135)
   Robert J. Drakulich (SBN: 281575)
2  **THE DRAKULICH FIRM, APLC**
   2727 Camino Del Rio S., Suite 322
3  San Diego, CA 92018
   Tel: (858) 755-6887
4  Fax: (858) 755-6456
   njd@draklaw.com
5  rjd@draklaw.com

6
   Daniel J. Thornburgh (PHV Applicant)
7  Nathan Bess (PHV Applicant)
   **AYLSOCK, WITKIN, KREIS &**
8  **OVERHOLTZ, PLLC**
   17 E. Main Street, Suite 200
9  Pensacola, FL 32502
   Tel: (850) 202-1010
10 Fax: (850) 916-7449
   dthornburgh@awko.com
11 nbess@awko.com

12 *Attorneys for Plaintiff,* CLAUDIA HAYES

13

14          SUPERIOR COURT OF THE STATE OF CALIFORNIA

15         FOR THE COUNTY OF SAN DIEGO - UNLIMITED CIVIL

16

17 CLAUDIA HAYES,                         | CASE NO.: 37-2022-00001812-CU-PL-CTL

18          Plaintiff,                     | **AMENDED COMPLAINT FOR**
                                            | **DAMAGES**
19 v.
                                            | **(1) NEGLIGENCE**
20 EISAI, INC., ARENA                      | **(2) STRICT LIABILITY – FAILURE**
   PHARMACEUTICALS, INC., and DOES 1-     |     **TO WARN**
21 100, inclusive,
                                            | **DEMAND FOR JURY TRIAL**
22          Defendants.
                                            |
23                                          | Judge: John S. Meyer
                                            | Dept.: C-64
24                                          | Action Filed: January 14, 2022

25
          Plaintiff, by and through undersigned counsel, hereby sues EISAI, INC. ("EISAI"), ARENA
26
   PHARMACEUTICALS, INC. ("ARENA"), and DOES 1-100 (collectively, "Defendants") and,
27
   upon information and belief, alleges as follows:
28

### INTRODUCTION

1. Defendants manufactured and distributed a prescription diet pill that causes cancer, including the rectal cancer Plaintiff developed after taking the diet pill for years. Defendants knew of the increased cancer risks from as early as the pre-clinical animal studies, and yet they never warned of the risk of cancer in the drug's label.  Additionally, Defendants never properly tested the drug, or monitored the reported adverse events of the drug.  The FDA (not the Defendants) did its own safety data analysis of the clinical trial data, as well as the adverse events reported as to cancer, and determined that the drug causes cancer, after which the FDA recalled the drug from the market.

2. This is an action for damages related to Defendants' wrongful conduct in connection with the development, testing, clinical trials, manufacturing, packaging, labeling, promoting, advertising, marketing, distribution and selling of lorcaserin hydrochloride as Defendants' prescription weight loss drug Belviq® (hereinafter "Belviq"), which was later recalled by FDA because it causes cancer.

3. Belviq's primary purpose is for chronic weight management, in addition to reduced-calorie diet and increased physical activity.  Belviq is manufactured as a pill suitable for oral consumption.

4. At all relevant times herein, Defendants were on notice, knew, or should have known, that Belviq could cause cancer, or that cancer, including rectal cancer, was a foreseeable risk of Belviq. Defendants failed to provide adequate warnings concerning Belviq's cancer risk to Plaintiff and to her prescribing physicians. Defendants failed to conduct adequate tests, and to perform a careful analysis of these tests and the safety data, which would have revealed increased cancer risks.

5. Nevertheless, at all times Plaintiff was prescribed, purchased, and ingested Belviq, Defendants failed to warn, advise, educate or otherwise inform Belviq users, prescribers or governmental regulators in the United States about the risk of cancer and the failure of Defendants to conduct proper tests. Indeed, at all times Plaintiff was prescribed, purchased, and ingested Belviq, the U.S. label did not contain any warning regarding the risk of cancer, nor the failure to conduct proper testing of the risks of cancer, despite information regarding these risks being available to

1  Defendants.

2      6.      Consequently, as a result of the foregoing acts, omissions, and wrongful conduct by

3  Defendants, Plaintiff used Belviq, which caused her to develop rectal cancer, as well as other severe

4  and personal injuries. As a proximate result of Defendants' negligent, reckless, grossly negligent and

5  wrongful actions, inactions, and/or conduct, Plaintiff was injured and suffered damages from the use

6  of Belviq.   Plaintiff therefore demands judgment against Defendants and requests, among other

7  things, compensatory damages, statutory damages, punitive damages, attorneys' fees, costs and all

8  other available remedies and damages allowed by law.

9

10                              **PARTY PLAINTIFF**

11      7.      Plaintiff, CLAUDIA HAYES, at all relevant times described herein, was, and is, a

12  citizen of the United States of America, and is a resident of San Diego County, State of California.

13      8.      Plaintiff was born on May 8, 1947.

14      9.      Plaintiff was prescribed Belviq by her physician, first began using Belviq on or about

15  March 2016, and continued to use Belviq through approximately October 2019.

16      10.     Plaintiff was given no warnings by her physicians about the serious risks of cancer

17  posed by Belviq. Plaintiff was given no warnings by Defendants of the risk of cancer, or the failure

18  of Defendants to conduct proper testing, before taking, while taking, and after discontinuing Belviq.

19  Plaintiff's prescribing physicians were given no warnings by Defendants of the risk of cancer from

20  taking Belviq, before, or during the time that Plaintiff took Belviq.

21      11.     As a result of her exposure to Belviq, Plaintiff was caused to suffer from rectal cancer.

22  After years of being exposed to Belviq, in or about October 2019, Plaintiff suffered from blood in

23  her stools, which led to medical treaters performing a colonoscopy and diagnosing her rectal cancer.

24  As a result of her use of Belviq, on October 31, 2019, Plaintiff was diagnosed with low rectal cancer,

25  more specifically, Stage III3B rectal cancer.

26      12.     Plaintiff did not discover, nor could she have discovered through the exercise of

27  reasonable diligence, that Belviq was a cause of her rectal cancer, until she saw reports in the media

28

3

following the FDA's February 13, 2020 Safety Communication, revealing that the FDA had requested that the manufacturer of Belviq withdraw Belviq from the U.S. market based on the FDA's review of the safety data from a clinical trial that showed that patients taking Belviq had an increased occurrence of cancer, including colorectal cancer.

13.     As result of her exposure to Belviq, Plaintiff was caused to sustain severe and permanent personal injuries, pain, suffering, and emotional distress.

14.     By reason of Defendants acts and omissions, Plaintiff suffered, and continues to suffer, from rectal cancer and/or its effects, and was compelled to undergo chemoradiation therapy, cancer surgery, and other related intensive treatments and care. Plaintiff continues to suffer from other severe personal injuries, which are permanent and lasting in nature, including physical pain, mental anguish, diminished enjoyment of life, and the need for lifelong medical treatment, monitoring and/or medications.

15.     Plaintiff has endured, and continues to suffer, the mental anguish and psychological trauma of living with the knowledge that she has suffered serious and dangerous side effects from Belviq, including rectal cancer, as well as the mental and emotional fear of redeveloping cancer or any of the other above-named health consequences.

16.     The injuries and damages sustained by Plaintiff were caused by Defendants' actions and Defendants' Belviq.

17.     By reason of the foregoing, Plaintiff has been severely and permanently injured, and will require more constant and continuous medical monitoring and treatment than prior to Plaintiff's use of Defendants' Belviq drug.

18.     At all relevant times, Plaintiff purchased Belviq in the State of California, ingested Belviq in the State of California, and was injured by Belviq in the State of California.

**PARTY DEFENDANTS**

**DEFENDNANT ARENA PHARMACEUTICALS, INC.**

19.     ARENA is a Delaware corporation, with its principal place of business in California.

4

At all relevant times herein, ARENA has had its principal place of business located at 6154 Nancy Ridge Drive, San Diego, California 92121.

20.    ARENA is involved in the research, manufacture, development, sales, and marketing of pharmaceutical products, including Belviq and lorcaserin hydrochloride.  At all relevant times herein, ARENA was in the business of, and was involved in, the researching, manufacturing, testing, advertising, promoting, marketing, selling, and distributing the drug Belviq.

21.    ARENA purposefully availed itself to California, because it had designed, manufactured, tested, sought regulatory approval for, and together with co-defendant EISAI, marketed, sold, and distributed Belviq in California, including the pills taken by Plaintiff.  ARENA, together with its co-defendants, packaged, labeled, promoted, advertised, marketed, distributed, and sold Belviq in the State of California, at all times Plaintiff was prescribed, purchased, and ingested Belviq.  Plaintiff's claims directly arise out of these forum-related activities by ARENA. Plaintiff used this defective product in California, and Plaintiff suffered, and continues to suffer, injuries in California.

**DEFENDANT EISAI, INC.**

22.    EISAI is a Delaware corporation with its principal place of business in New Jersey. Its principal place of business is located at 100 Tice Boulevard, Woodcliff Lake, New Jersey 07677.

23.    EISAI is involved in the research, development, sales, distribution, and marketing of pharmaceutical products, including Belviq and lorcaserin hydrochloride.  At all relevant times herein, EISAI was in the business of, and did research, test, advertise, promote, market, sell, and distribute the drug Belviq.

24.    EISAI purposefully availed itself to California, because it had marketed, co-marketed, sold, and distributed Belviq in California, including the pills taken by Plaintiff.  EISAI, together with its co-defendants, packaged, labeled, promoted, advertised, marketed, distributed, and sold Belviq in the State of California, at all times Plaintiff was prescribed, purchased, and ingested Belviq. Plaintiff's claims directly arise out of these forum-related activities by EISAI. Plaintiff used this

defective product in California, and Plaintiff suffered, and continues to suffer, injuries in California.

**DOE DEFENDANTS**

25.      Defendants Does 1 through 100, inclusive, are sued herein under fictitious names. Their true names and capacities, whether individual, corporate, associate, or otherwise, are unknown to Plaintiffs.  Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named Defendants is responsible in some manner for the events and occurrences alleged herein, and that Plaintiff's damages were proximately caused by those Defendants.  Plaintiff will amend this complaint to show their true names and capacities when the same have been ascertained.  Each reference in the complaint to Defendant, a Defendant, or a specifically named Defendant refers to all named Defendants and those sued under fictitious names.

26.      Plaintiff is informed and believes, and based thereon alleges, that at all times mentioned herein, each of the Defendants, including Defendant DOES 1 through 100, inclusive, and each of them, was the agent, servant, employee and/or representative of each of the remaining Defendants and was, at all times material hereto, acting within the authorized course and scope of said agency, service, employment and/or representation, and/or that all said acts, conduct, and omissions were subsequently ratified by the respective principles and the benefits thereof accepted by such principals.

**JURISDICTION & VENUE**

27.      Plaintiff, CLAUDIA HAYES, is a citizen of the United States of America, and is a resident of San Diego County, State of California.

28.      Plaintiff was prescribed Belviq in the State of California, purchased Belviq in the State of California, ingested Belviq in the State of California, was injured by Belviq in the State of California, and was treated for injuries caused by Belviq in the State of California.

29.      Likewise, ARENA, at all relevant times herein, has been "at home" in California due to its principal place of business being in San Diego, California.

30.     ARENA researched, developed, tested, and sought initial approval from the United States Food & Drug Administration ("FDA") for Belviq at its San Diego, California location. ARENA researched, developed, and together with its co-defendants, sold and marketed Belviq and lorcaserin hydrochloride in California. ARENA communicated regularly with the FDA regarding Belviq from its San Diego, California location.

31.     EISAI packaged, labeled, promoted, advertised, marketed, distributed, and sold Belviq in the State of California, including to Plaintiff and her physician.

32.     Defendants conducted and/or sponsored numerous clinical trials regarding Belviq at numerous sites throughout the State of California. By way of example, the post-marketing CAMELLIA-TMI 61 multi-center clinical trial referenced hereinafter, included over thirty medical centers located throughout the State of California, including at several medical centers located in San Diego, California.

33.     Venue in this action properly lies in the Superior Court of California, San Diego County, in that Defendant ARENA, at all relevant times herein, maintains its principal place of business in San Diego County. In addition, Plaintiff is a resident of San Diego, California, and Belviq was distributed and sold to Plaintiff in California.

## **FACTUAL BACKGROUND**

### **The FDA's Conditional Approval of Belviq in the United States**

34.     At all relevant times herein, Defendants were in the business of, and did design, manufacture, sell, distribute and supply Belviq for chronic weight management.

35.     ARENA submitted the New Drug Application for Belviq to the FDA on or about December 18, 2009, requesting that the FDA grant it approval to market and sell Belviq, also known as lorcaserin hydrochloride, in the United States, as an adjunct to a reduced-calorie diet and increased physical activity, for chronic weight management in adult patients with a body mass index (hereinafter referred to as "BMI") greater than or equal to 30 kg/m$^2$ or adult patients with a BMI greater than or equal to 27 kg/m$^2$ and at least one weight-related comorbid condition.

36.     ARENA received FDA approval for Belviq on June 27, 2012, as an adjunct to reduced-calorie diet and increased physical activity for chronic weight management in adult patients with a body mass index (hereinafter referred to as "BMI") greater than or equal to 30 kg/m2 or adult patients with a BMI greater than or equal to 27 kg/m2 and at least one weight- related comorbid condition.  The FDA's approval was conditioned upon, and subject to, the requirement of ARENA conducting certain post approval safety tests.

37.     Four years later, on July 15, 2016, ARENA received additional FDA approval for Belviq XR, an extended-release tablet of lorcaserin hydrochloride, for the same indication as Belviq (hereinafter Belviq and Belviq XR will be collectively referred to as "Belviq").

**Defendants Joint Agreements to Manufacturer, Market, and Distribute Belviq**

38.     ARENA and EISAI entered into the first Marketing and Supply Agreement in July 2010 and, later in May 2012, ARENA and EISAI entered into a revised agreement, entitled "Amended and Restated Marketing and Supply Agreement."

39.     Defendants entered into the Amended and Restated Marketing and Supply Agreement to establish a collaboration to support Belviq's development, approval and commercialization.  The full terms of the agreement are within the custody and control of Defendants.

40.     ARENA and EISAI jointly launched Belviq in the United States in 2012, with ARENA manufacturing Belviq, and EISAI as the exclusive distributor.

41.     Following the FDA's approval of Belviq, ARENA announced on its website that its then current strategy was to first focus its efforts on the commercialization of Belviq in North and South America, pursuant to the terms of the Amended and Restated Marketing and Supply Agreement with EISAI.

42.     Following FDA approval, ARENA promoted the safety, efficacy and sale of Belviq in the United States on its website, in press releases, through in-person presentations at conferences, in the drug's label, in print materials, through websites associated with Belviq, such as belviqnow.com, as well as other public outlets.

43.     At all relevant times, ARENA maintained responsibility with EISAI for the commercialization, marketing, distribution and sale of Belviq in the United States.

44.     After ARENA received additional FDA approval for Belviq XR, ARENA and EISAI entered into the Second Amended and Restated Marketing and Supply Agreement in November 2013, to account for both Belviq and Belviq XR.  ARENA entered into the Second Amended and Restated Marketing and Supply Agreement with EISAI to establish a collaboration  to support Belviq's development, approval, and commercialization. The full terms of the agreement are within the custody and control of Defendants.

45.     Belviq XR was jointly launched by ARENA and EISAI in the United States in 2016, with ARENA manufacturing Belviq XR, and EISAI as the exclusive distributor.

46.     Following the FDA's approval of Belviq XR, Defendant ARENA promoted the safety, efficacy and sale of Belviq XR in the United States on its website, in press releases, through in-person presentations at conferences, in the drug'slabel, through the sales force, in print materials, through websites associated with Belviq, such as belviqnow.com, as well as other public outlets.

47.     On October 15, 2013, Arena issued a press release regarding Defendants' marketing strategy, titled: *Arena Pharmaceuticals Reports That Eisai Will Double BELVIQ® (lorcaserin HCl) CIV Sales Force by December; Expansion to Approximately 400 Sales Specialists Follows Increased Coverage of BELVIQ by Health Plans and Pharmacy Benefit Managers.* The press release reported that EISAI (who is responsible for the marketing and distribution of Belviq under its agreement with ARENA) is doubling the size of its sales force to approximately 400 sales representatives to reach approximately 65,000 physicians, and that it expects that the expansion of the Belviq sales force will "help communicate the safety and efficacy of Belviq to an increased number of physicians."

48.     At all relevant times, ARENA PHARMACEUTICALS, INC. maintained responsibility with Defendant EISAI for the commercialization, marketing, distribution and sale of Belviq XR in the United States.

49.     In 2017, EISAI purchased the global rights to develop and market Belviq from ARENA. The full terms of the agreement are within the custody and control of Defendants.

50.     This purchase was the subject of a press release by EISAI CO., LTD, in which it announced that, in association with Defendant EISAI, it had reached an agreement with ARENA to revise the previous marketing and supply agreement that it had concluded with ARENA's wholly-owned subsidiary, ARENA PHARMACEUTICALS GmbH and, under the new agreement, EISAI acquired rights to develop and market Belviq from both ARENA and ARENA PHARMACEUTICALS GmbH. *See: https://www.eisai.com/news/news201701.html.*

51.     On January 4, 2017, ARENA issued its own press release announcing that ARENA and EISAI amended the Marketing and Supply Agreement for Belviq globally. The ARENA press release stated that "Our US operations are located in San Diego, California". The press release advised that, under the revised agreement, ARENA will continue to manufacture Belviq and that EISAI will control the global development and commercialization decisions. The financial terms reflected that ARENA will receive multi-millions of dollars in cash payments and costs relief, as well as remain eligible to receive multi-millions of dollars stemming from royalty payments from global sales of Belviq. The press release further stated that: "ARENA will continue to be eligible to receive royalty payments on net sales of BELVIQ and participate in the upside potential of lorcaserin from additional geographies and clinical trials, such as the ongoing cardiovascular outcomes trial, CAMELLIA."     *https://invest.arenapharm.com/news-releases/news-release-details/arena-pharmaceuticals-and-eisai-amend-marketing-and-supply*

**Belviq's Pre-Clinical Rats Studies Showed Increased Cancer Risk**

52.     Belviq is a first-in-class oral selective serotonin 5HT2c receptor agonist and is available, by prescription only, in oral tablets at doses of 10mg taken twice daily or 20mg extended release taken once daily.

53.     During the preclinical trial program for Belviq, Defendants conducted a two-year carcinogenicity study in rats (hereinafter referred to as the "two-year carcinogenicity rat study"), in which lorcaserin was identified as a non-genotoxic carcinogen that induced multiple tumor types; this identification was primarily due to an increase in mammary tumors found in both sexes near clinical exposure, and at all doses in female rats.

54.     This same preclinical, two-year carcinogenicity rat study also revealed an increase in astrocytomas, malignant schwannomas, hepatocellular adenoma and carcinoma, skin subcutis fibroma, skin squamous carcinoma, and thyroid follicular cell adenoma in male rats. Adenocarcinoma diagnosed in the lorcaserin groups were associated with increased tumor onset, multiplicity, and lung metastases. Fibroadenoma in the lorcaserin groups also demonstrated greater incidence and multiplicity.

55.     While the two-year carcinogenicity rat study was ongoing, the FDA required bi-monthly updates from Defendants due to the consistently increased incidence of tumors and mortality that was being seen in the lorcaserin groups. However, in the final report of the study, Defendants reported that the incidence of adenocarcinoma was lower in the mid- and high-dose groups than that previously reported at week 96, and that it had increased in the control group. The final report also revealed that the incidence of fibroadenoma had increased across all doses from week 96, with notable variations in the mid- and high- dose groups. Due to the apparent increase in fibroadenoma accompanying the decrease in adenocarcinoma after week 96, the FDA suspected that study investigators had reclassified tumor types.

56.     Defendants attributed the increased incidence of tumors seen in the two-year carcinogenicity rat study to elevated prolactin levels induced by lorcaserin in rats, which they claim was a rodent-specific phenomenon.

57.     In addition to two-year carcinogenicity rat study, during the preclinical trial program, Defendants also conducted a two-year carcinogenicity study in mice (hereinafter referred to as the "two- year carcinogenicity mouse study"), which demonstrated an increase in malignant hepatocellular carcinoma in males and schwannoma in females. Although the dosing levels were below the clinical dose, these findings provide further context and support for the potential carcinogenicity of lorcaserin, particularly in combination with the results of the two-year carcinogenicity rat study.

58.     The two-year carcinogenicity rat study, the two-year carcinogenicity mouse study, and/or a combination of both, put Defendants on notice, and/or should have put Defendants on notice,

that lorcaserin was a carcinogen and/or that further testing needed to be done, testing that would have confirmed lorcaserin as a carcinogen and an unreasonably dangerous product.

**Belviq's Pre-Approval Clinical Trials were Inadequately Designed To Monitor the Risk of Cancer and the Results Showed a Lack of Efficacy**

59.     In addition to the aforementioned animal studies, there were also pre-approval clinical trials.  However, the pre-approval clinical trials were only designed to study one year of exposure to lorcaserin (Belviq) and were designed only to monitor the patients for a short period after exposure to the drug.

60.     Upon information and belief, in their pre-approval clinical trials, Defendants limited their safety data and reports to only the time period of the studies and did not continue to monitor the safety of the patients afterwards.

61.     Further, upon information and belief, the pre-approval clinical trials were not adequately powered to properly monitor for the increased risk of cancer.

62.     As cancer can take years to develop, none of the pre-approval clinical trials were adequately designed for reliable results regarding the risk of cancer, even though the animal data had already created a legitimate safety concern regarding the increased risk of cancer.

63.     Not only were the pre-approval clinical trials inadequately designed to properly monitor the increased risk of cancer, the results of the pre-approval clinical trials showed a lack of (or very limited/minimal) efficacy of Belviq for its intended purpose.

64.     From September 2006 through February 2009, Defendants conducted the Behavioral modification and Lorcaserin for Overweight and Obesity Management (BLOOM) trial – a two-year, randomized, placebo-controlled, double-blind, multicenter clinical trial involving 3,182 patients – to examine the efficacy of lorcaserin in reducing body weight in the United States. In BLOOM the patients were exposed to either lorcaserin or a placebo for approximately a year and were then monitored another year following.  While weight reduction was seen in the first year, all treatment groups experienced weight regain during the second year. In July 2010, the results of the BLOOM

trial were published in the New England Journal of Medicine (hereinafter referred to as "NEJM"). Smith S.R., et al. Multicenter, Placebo- Controlled Trial of Lorcaserin for Weight Management. N. Engl. J. Med 2010;363:245-56.

65.    Additionally, from December 2007 to July 2009, Defendants conducted the Behavioral modification and Lorcaserin Second Study for Obesity Management (BLOSSOM) trial – a one-year randomized, placebo-controlled, double-blind, parallel arm trial involving 4,008 patients – to examine the effects of lorcaserin on body weight, cardiovascular risk, and safety in the United States. In July 2011, the results of the BLOSSOM trial were published in the Journal of Clinical Endocrinology and Metabolism. Fidler, M.C., et al. A One-Year Randomized Trial of Lorcaserin for Weight Loss in Obese and Overweight Adults: the BLOSSOM trial. J Clin Endocrinol Metab 2011;96:3067-3077.

66.    Combined data from the BLOOM and BLOSSOM trials demonstrated only a 3.3% mean weight loss after one year with lorcaserin over that of the placebo group, demonstrating that lorcaserin failed to meet the mean efficacy criterion of FDA's obesity draft guidance.

**The FDA Initially Rejected Belviq Because of Cancer Concerns**

67.    On December 18, 2009, Defendant ARENA submitted its first New Drug Application for Belviq, seeking to market and distribute Belviq in the United States.

68.    On September 16, 2010, the Endocrinologic and Metabolic Drugs Advisory Committee (hereinafter referred to as "EMDAC") met to discuss approval of Belviq based on the results of preclinical trials and the BLOOM and BLOSSOM Phase 3 clinical trials. The EMDAC panel voted nine (9) to five (5) against approval of Belviq, as the potential benefits did not outweigh the potential risks based on concerns about the preclinical carcinogenicity findings (i.e., increased mammary adenocarcinoma/fibroadenoma and brain astrocytomas in rats) and marginal weight loss demonstrated by the clinical trials.

69.    On October 28, 2010, the FDA issued a Complete Response Letter (CRL) rejecting approval of Belviq. The bases for the CRL included uncertainty in diagnosis of mammary masses in

1  rats, unresolved issues with the exposure-response relationship between lorcaserin and mammary
2  adenocarcinoma, failure to identify a mode of action and a clear safety margin for brain astrocytoma,
3  and marginal weight loss results.

4      70.     In response to the CRL, Defendants convened a pathology working group (hereinafter
5  referred to as "PWG") to blindly re-adjudicate the preclinical mammary tumor data in rats.

6      71.     The CRL also requested that Defendants submit the final report from the third Phase
7  3 trial in overweight and obese patients with Type 2 Diabetes Mellitus.

8      72.     From December 2007 to August 2010, Defendants conducted the Behavioral
9  modification and Lorcaserin for Obesity and Overweight Management in Diabetes Mellitus
10  (BLOOM-DM) trial – a one- year, randomized, placebo-controlled trial involving 604 patients – to
11  examine the efficacy and safety of lorcaserin for weight loss in patients with Type 2 Diabetes Mellitus
12  in the United States. After one year, there was only a 3.1% mean weight loss with lorcaserin over
13  that of the placebo group. In April 2012, the results of the BLOOM-DM trial were published in the
14  journal of The Obesity Society. O'Neil, P.M., et al. Randomized Placebo-Controlled Clinical Trial
15  of Lorcaserin for Weight Loss in Type 2 Diabetes Mellitus: The BLOOM-DM Study. Obesity
16  2012;20:1426-1436.

17     73.     On December 27, 2011, in response to the CRL, Defendants submitted to the FDA
18  the final report of the BLOOM-DM study and data from the PWG readjudication, as well as new
19  studies Defendants claimed supported their continued assertion that the increase in tumors seen in
20  the two-year carcinogenicity rat study was due to elevated prolactin levels induced by lorcaserin,
21  again claiming it was a rodent-specific phenomenon.

22     74.     As to the PWG re-adjudication, the PWG found a decreased number of
23  adenocarcinoma and an increased number of fibroadenoma in both the control and the lorcaserin
24  groups, which they claim was a rodent-specific phenomenon.

25     75.     As to the PWG re-adjudication, for adenocarcinoma, the number decreased to a larger
26  extent in the lorcaserin group compared to the control group, but lorcaserin still increased the
27  incidence, tumor onset and multiplicity, and lethality of mammary adenocarcinoma, and the high-

28

dose lorcaserin group maintained a statistically significant increase in adenocarcinomas compared to the control group. Regarding fibroadenoma, there was an increase in the incidence, tumor onset and multiplicity, and lethality across all lorcaserin dose groups compared to the control group; yet despite their relevance, these results were disregarded as irrelevant to risk of carcinoma in FDA's review of the readjudication data.

76.     Upon information and belief, the PWG re-adjudication procedure and its results were mis-adjudicated, misapplied, misinterpreted and/or otherwise skewed in favor of Defendants and, particularly, a finding that lorcaserin was not a carcinogen; nevertheless, even if accepted as true, the results of the PWG re-adjudication, reviewed separately and/or in combination with the initial results of the two-year carcinogenicity rat study, the two-year carcinogenicity mouse study and/or both, put Defendants on notice, or should have put Defendants on notice, that lorcaserin was a carcinogen and/or that further testing needed to be done, testing that would have confirmed lorcaserin as a carcinogen.

77.     On May 10, 2012, a second EMDAC panel met to discuss approval of Belviq, with a focus on the PWG readjudication of preclinical data to determine the drug's potential carcinogenicity risk, to determine a safety margin for astrocytoma by looking at lorcaserin levels in human cerebrospinal fluid, and to discuss the results of the BLOOM-DM Phase 3 clinical trial to further determine efficacy. The panel voted eighteen (18) to four (4), with one abstention, that the benefits of Belviq outweighed the risks for an overweight and obese population. The panel also recommended a post-approval assessment of risk for Belviq, with a focus on cardiovascular risk. Ultimately, the FDA required that Defendants conduct six (6) post-marketing studies, including a cardiovascular outcomes trial.

78.     On June 26, 2012, in his Summary Review of Defendants' application for approval following submission of data in response to the CRL, the FDA Deputy Division Director, Dr. Eric Colman, indicated that the PWG's analysis addressed the concerns raised by the data in the original application, and that he did not believe Belviq posed a risk for mammary adenocarcinoma in humans. He also stated that the cerebrospinal fluid data provided an adequate safety margin for brain

astrocytoma. However, regarding tumorigenic mechanism of action, Dr. Colman noted that the FDA Pharmacology/Toxicology reviewer, Dr. Fred Alavi, concluded that the prolactin studies, while supportive of a plausible role of prolactin in tumor formation, fell short of definitive proof that elevated prolactin levels were the reason increased tumors were seen during the two-year carcinogenicity rat study.

**Defendants Withdrew Its European Submission of Belviq Because of Concerns About Cancer Risks and Yet Defendants Never Updated the US Label to Include Adequate Warnings of Cancer Risks**

79.     In stark contrast to the FDA's approval of Belviq, despite the aforementioned testing, results and findings, on May 3, 2013, Defendants withdrew the application for marketing authorization for Belviq with the European Medicines Agency (hereinafter referred to as "EMA").

80.     In reviewing the data submitted by Defendants, the EMA Committee for Medicinal Products for Human Use (hereinafter referred to as "CHMP") determined that Belviq was not approvable due to major objections regarding carcinogenicity and efficacy. Specifically, the CHMP found that, even with the PWG re-adjudication, the risk of carcinogenicity in humans needed further consideration, and the overall clinical risk/benefit balance was negative in that the modest efficacy results did not outweigh safety concerns. The CHMP further stated that the increased occurrence of several tumor types in male rats was particularly concerning due to the lack of any persuasive mechanism of action that would provide assurance of safety in human use, which also undermined any discussion on exposure margins. Thus, the CHMP concluded that the clinical relevance of the tumors found in the two-year carcinogenicity rat study must be evaluated as part of the risk-benefit assessment.

81.     After Defendants withdrew Belviq from the European review process due to the review committee's concerns about increased cancer risks based on the animal data and Defendants' lack of a reliable and plausible explanation for the increased risk of cancer not being caused by Belviq, Defendants chose not to update the US label of Belviq to include adequate warnings about the increased risks of cancer, to enable patients to make an informed decision.

**All of Defendants' Labels for Belviq were Inadequate in Warning About Cancer**

82.     Defendants revised their label for Belviq on numerous occasions, including in 2016 and 2017, but always failed to adequately warn about the increased risk of cancer.

83.     None of Defendants' labels for Belviq have any reference to the increased risk of cancer in the warnings, precautions, contraindications, or the adverse reactions sections of the labels. In fact, the word cancer is never stated anywhere, in any of the labels.

84.     Further, buried on page 18 of the 2017 label, is the non-clinical toxicology section, which mention the rat and mouse studies, but fails to provide adequate information about the severity of the issue.  For example, in the mouse study, there was an increase in malignant hepatocellular carcinoma in males and schwannoma in females. These findings provide further context and support for the potential carcinogenicity of Belviq, particularly in combination with the results of the two-year carcinogenicity rat study. However, this data was not included in the label. Rather, Defendants merely stated: "There were no treatment-related increases in the incidence of any tumor in mice at doses that produced plasma exposure in males and females…"

**Post-Marketing Clinical Trial  Data Shows Increased Cancer Risk**

85.     From January 2014 to June 2018, Defendants conducted a post-marketing trial of lorcaserin - the Cardiovascular and Metabolic Effects of Lorcaserin in Overweight and Obese Patients – Thrombolysis in Myocardial Infarction 61 (CAMELLIA-TIMI 61).

86.     CAMELLIA-TIMI 61 was a randomized, double-blind, placebo-controlled, multicenter, parallel group clinical trial involving 12,000 patients conducted in the United States, Canada, Mexico, the Bahamas, Europe, South America, Australia, and New Zealand, to evaluate the risk of heart-related issues with Belviq. The primary safety outcome of major adverse cardiovascular events showed noninferiority. The results of CAMELLIA-TIMI 61 were published in September 2018 in NEJM. Bohula, E.A., et al. Cardiovascular Safety of Lorcaserin in Overweight or Obese Patients. N. Engl. J. Med. 2018;379:1107-17.

87.     In their published study, Defendants never discussed the increased risk of cancer.

**FDA Recalls Belviq**

88.     On January 14, 2020, the FDA issued a safety communication regarding clinical trial results showing a plausible increased risk of cancer with Belviq. The FDA stated that its evaluation of the potential signal was ongoing, and a causal association was at that time uncertain.

89.     On February 13, 2020, the FDA announced it had requested that Defendants voluntarily withdraw Belviq from the U.S. market, because the safety data from a clinical trial showed an increased occurrence of cancer.

90.     The FDA said in its recall, "We are taking this action because we believe that the risks of lorcaserin outweigh its benefits based on our completed review of results from a randomized clinical trial assessing safety."

91.     When the FDA approved Belviq in 2012, it required Defendants to conduct a randomized, double-blind, placebo-controlled clinical trial to evaluate the risk of cardiovascular problems. The FDA's analysis of the safety data from this study found that more patients taking Belviq were diagnosed with cancer compared to those taking a placebo.

92.     In its recall announcement, the FDA went on to say, "A range of cancer types was reported, with several different types of cancers occurring more frequently in the lorcaserin group, including pancreatic, colorectal, and lung."

93.     The FDA reported that analysis of the CAMELLIA-TIMI 61 data indicated an imbalance of cancer in patients taking Belviq that increased with treatment duration, including pancreatic, colorectal, and lung cancer. Specifically, one additional cancer was observed per 470 patients treated for one year, with 462 (7.7%) Belviq patients diagnosed with 520 primary cancers, compared to 423 (7.1%) with 470 cancers in the placebo group.

94.     The FDA further stated the risks of Belviq outweigh its benefits, and recommended patients stop taking Belviq and dispose of any unused pills.

95.     The FDA also instructed all health care professionals to stop prescribing Belviq, and to contact their patients taking Belviq to inform them of the increased risk of cancer and ask that they stop taking Belviq.

**New England Journal of Medicine Peer Reviewed Article about the Dangers of Belviq**

96.     In the September 10, 2020 issue of the New England Journal of Medicine, the FDA submitted an article entitled: "**Cancer Risk Associated with Lorcaserin — The FDA's Review of the CAMELLIA-TIMI 61 Trial**".

97.     The article makes clear that the FDA's decision to request the voluntary recall of the oral weight-loss drug lorcaserin (Belviq, Belviq XR) came after a careful analysis by the FDA (not by the Defendants) of the post marketing safety data revealing excess cancer risk and death.

98.     The FDA authors stated, in part, as follows:

> On February 13, 2020, the Food and Drug Administration (FDA) announced that it had requested that the manufacturer of Belviq and Belviq XR (lorcaserin and extended-release lorcaserin) voluntarily withdraw the products from the U.S. market. The agency's request was based on its assessment of lorcaserin's benefits and risks after a review of a large post marketing clinical trial that revealed a higher frequency of cancer diagnosis in the lorcaserin group than in the placebo group…

> *The FDA did not approve the original marketing application for lorcaserin, submitted in December 2009, in part because nonclinical carcinogenicity studies revealed an increased incidence of several tumor types in rats exposed to the drug… As a condition of approval, the FDA required Arena to conduct a post marketing study focused on cardiovascular safety…*

> The randomized placebo-controlled CAMELLIA-TIMI 61 trial, conducted from 2014 through 2018, evaluated lorcaserin's effect on the incidence of major adverse cardiovascular events (MACE) in 12,000 patients randomly assigned to lorcaserin or placebo in a 1:1 ratio…

> *The published report identified no safety signal related to cancer. The FDA's initial safety analyses of the CAMELLIA study report identified a potential signal of increased cancers and cancer-related mortality. In contrast to the published study, when assessing cancer incidence, the FDA considered all post randomization adverse events, not just "on treatment" events (those that occurred within 30 days after drug discontinuation) …*

> *The cancer-related safety signal from nonclinical studies supports the plausibility of an excess cancer risk from lorcaserin, and the consistency of cancer findings in CAMELLIA-TIMI 61 and the robustness of sensitivity analyses further support a causative effect. The increased risk of various cancer types associated with lorcaserin in the clinical study reflects the pattern seen in nonclinical studies…*

> Balancing the clinical importance of cancer and the difficulty of mitigating this risk against the uncertain clinical benefit of lorcaserin, however, we conclude that the

19

therapy's benefits do not outweigh the risks for any identifiable patient population.

N. Engl. J. Med. 2020; 383:1000-1002. (*Emphasis* provided)

99.     In their clinical trials, Defendants limited their safety data and reports to only patients that were diagnosed with cancer within a month of discontinuing the medication, and excluded in their analyses other patients who developed cancer after they stopped taking the pill.

100.    Cancer can take years to develop, but can be caused by previous exposure to a carcinogen.

101.    In contrast to the Defendants' improper and limited view, when assessing the cancer incidence of Belviq, the FDA considered all reported adverse events, not just "on treatment" events (those that occurred within 30 days after drug discontinuation).

102.    The FDA (not the Defendants) did its own safety data analysis of the clinical trial data, as well as the adverse events reported as to cancer, and determined that the drug causes an excess risk cancer.

103.    After which the FDA recalled the drug from the market.

**Belviq is an Unreasonably Dangerous Drug with Inadequate Warnings**

104.    The aforementioned facts support that Belviq is not an effective drug to use as an adjunct to a reduced-calorie diet and increased physical activity for chronic weight management in adults with certain initial BMI.

105.    The aforementioned facts support that Belviq is not a safe drug to use as an adjunct to a reduced-calorie diet and increased physical activity for chronic weight management in adults with certain initial BMI.

106.    The aforementioned facts support that Belviq is associated with an increased risk of cancer.

107.    The aforementioned facts support that the efficacy of Belviq is not outweighed by its safety risks, particularly its increased risk of cancer.

108.    The aforementioned facts support that Belviq was not sufficiently and/or adequately

20

tested for safety by Defendants.

109.    Prior to applying for and obtaining approval of Belviq, Defendants knew or should have known that human consumption of Belviq was associated with, and/or would cause, the induction of cancer, and Defendants possessed pre-clinical scientific studies, which Defendants knew or should have known, were a signal that Belviq could cause cancer and/or the cancer risk needed further testing and studies prior to its introduction to the market.

110.    Upon information and belief, despite cancer findings in animal carcinogenicity studies, Defendants failed to adequately conduct complete and proper testing of Belviq prior to filing their New Drug Application for Belviq.

111.    From the date Defendants received FDA approval to market Belviq, Defendants manufactured, distributed, marketed, and sold Belviq without adequate warning to Plaintiff's prescribing healthcare provider, or to Plaintiff, that Belviq was associated with, and/or could cause cancer, presented a risk of cancer in patients who used it, and that Defendants had not adequately conducted complete and proper testing and studies of Belviq with regard to carcinogenicity.

112.    Upon information and belief, Defendants ignored the association between the use of Belviq and the risk of developing cancer.

113.    Defendants failed to adequately warn plaintiff and her physicians of the plausible increased risk of cancer in Belviq seen in the nonclinical trials.

114.    Defendants further failed to adequately warn plaintiff and her physicians of their failure to conduct adequate tests and analyses of the cancer risks of Belviq.

115.    Defendants failed to design and conduct adequate tests, studies, and analyses for the cancer risk of Belviq.

116.    Defendants failed to adequately monitor and analyze the safety data and adverse events for the cancer risk of Belviq.

117.    Defendants' failure to disclose information that they possessed regarding the failure to adequately test and study Belviq for cancer risk further rendered the warnings for this medication inadequate.

118.     Plaintiff did not discover, nor could she have discovered through the exercise of reasonable diligence, that Belviq was a cause of her rectal cancer until she saw reports in the media following the FDA's February 13, 2020 Safety Communication, revealing that the FDA had requested that Defendants withdraw Belviq from the U.S. market based on the FDA's review of the safety data from a clinical trial that showed that patients taking Belviq had an increased occurrence of cancer, including colorectal cancer.

119.     Plaintiff did not discover that Belviq had an increased risk of cancer during the time that she was prescribed and/or used Belviq.  Plaintiff did not discover that Belviq had an increased risk of cancer until after media reports regarding the FDA recall of Belviq in February 2020.  Plaintiff was unable to make an earlier discovery that Belviq increased the risk of cancer. As a result of the acts and omissions of Defendants, neither Plaintiff, nor her physicians, could have discovered, through the exercise of reasonable due diligence, that exposure to Belviq was associated with increased risk of cancer.

120.     Defendants were under a continuing duty to disclose the true character, quality, safety issues and safety concerns of Belviq to its users, including Plaintiff, but failed to do so. Throughout the time period when Plaintiff was prescribed and ingested Belviq, Defendants failed to adequately and fully inform patients and doctors, including Plaintiff and her prescribing physicians, about the increased risk of cancer associated with Belviq.  Plaintiff relied upon Defendants' misrepresentations and/or omissions when she continued to use Belviq as prescribed.

**Defendants Acted in Conscious Disregard of Safety**

121.     Defendants' conduct as alleged herein was grossly negligent and done with reckless disregard for human life. Defendants' conduct as alleged herein was done with malice.  Defendants acted with oppression, fraud or malice and their actions were carried on with a willful and conscious disregard of the safety of others, including to Plaintiff.

122.     Defendants acted with conscious disregard for the safety of the patients, including Plaintiff, because Defendants were aware of the plausible dangerous consequences of Belviq

1   increasing the risk of cancer, and failed to avoid these consequences or even warn of the increased

2   risk.

3       123.    Defendants knew of the probability of the increased risk of cancer from taking Belviq

4   from its own previous testing and animal studies. Defendants could have made inexpensive design

5   changes, including adding a warning in the product labeling, but instead deferred and denied these

6   corrective actions in conscious disregard for the safety of the patients, including Plaintiff.

7       124.    Defendants also acted with conscious disregard for the safety of the patients, including

8   Plaintiff, because Defendants failed to adequately test Belviq.  Adequate testing would have revealed

9   an association between Belviq and cancer. Defendants' testing on Belviq was inadequate and

10  Defendants' decision not to do any further testing, even after being on notice of this plausible increase

11  cancer risk and dangerous propensities, shows they acted with conscious disregard for the safety of

12  the patients, including Plaintiff.  Defendants' failure to adequately test its product before marketing

13  it, or during marketing, is confirmation defendants acted with conscious disregard for safety.

14      125.    Defendants further acted with conscious disregard for the safety of the patients,

15  including Plaintiff, because Defendants failed to adequately monitor the safety reports of Belviq and

16  take corrective action, including updating the label to warn of the increased risk of cancer.

17  Defendants were aware of the increased risk of cancer from the preclinical animal studies, and yet

18  never adequately and/or timely identified, made, or monitored a safety signal for cancer in the adverse

19  event reporting. Additionally, upon information and belief, Defendants were aware of adverse events

20  reported to the company from patients and prescribing physicians, and yet did practically nothing

21  after receiving these reports. Defendants' failure to warn patients and prescribing physicians of the

22  increased risk of cancer.

23      126.    Defendants were fully aware of the safety risks of Belviq, dating back to their

24  preclinical and clinical trials. Nonetheless, Defendants deliberately crafted their label, marketing, and

25  promotion, to mislead consumers and their physicians on these serious and permanent life-altering

26  injuries.

27      127.    This conduct by the Defendants was not done by accident. Rather, Defendants knew

28

23

that they could turn a profit by convincing physicians and consumers that Belviq was safe and came without any serious harmful risks. Defendants further knew that full disclosure of the true risks of Belviq would limit the amount of money it would make selling the drug. Defendants' object was accomplished not only through inadequate warnings in their label, but through a comprehensive scheme of continuing to promote the safety of Belviq, while simultaneously failing to timely and adequately test, analyze, and report of the excess cancer risk.

128.    Plaintiff's physician and Plaintiff were denied the opportunity and the right to have a discussion, in order to make an informed decision about whether to prescribe and take Belviq. Defendants accomplished this by failing to provide them with adequate information about the serious risks of cancer from Belviq. Such conduct was done with conscious disregard of Plaintiff's rights.

129.    Defendants failed to timely and adequately perform a careful analysis of the post marketing safety data that would have revealed an excess cancer risk and deaths, as well as to timely and adequately warn of this dangerous risk.

130.    Defendants were on notice of the plausible increased risk of cancer seen in the nonclinical studies. A proper and careful review of all the adverse events (including the adverse events from clinical trials) would have reflected the cancer pattern seen in the nonclinical trials.

131.    Defendants recklessly failed to do so, and their wrongful actions and inactions are a stark departure from those of a reasonably prudent manufacturer/distributor of prescription drugs.

132.    Defendants' conduct was reckless and malicious and reflects a conscious disregard of the health and safety of others, including the plaintiff.

133.    Accordingly, Plaintiff requests punitive damages against Defendants for the harm caused to Plaintiff.

**FIRST CAUSE OF ACTION**
**AS AGAINST ALL DEFENDANTS**
**(NEGLIGENCE)**

134.    Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more

1  fully set forth herein.

2      135.    Defendants manufactured, distributed, and sold Belviq.

3      136.    Defendants had a duty to use reasonable care, which is the care that a reasonably

4  careful designer, manufacturer, seller, distributor or supplier of prescription drugs would use under

5  like circumstances.

6      137.    Reasonable care on the part of Defendants required that they give appropriate

7  warnings about particular risks of Belviq, which Defendants knew or should have known were

8  involved in the reasonably foreseeable use of Belviq.

9      138.    Reasonable care on the part of Defendants required that they design and perform

10  adequate and timely testing, studies, and analysis on their prescription drug, Belviq, including testing

11  and studies for particular risks of Belviq, which Defendants knew or should have known were

12  involved in the reasonably foreseeable use of Belviq.

13      139.    Reasonable care on the part of Defendants required that they properly and adequately

14  monitor the safety data, including adverse events reported on their prescription drug, Belviq, for

15  particular risks of Belviq which Defendants knew or should have known were involved in the

16  reasonably foreseeable use of Belviq.

17      140.    Reasonable care on the part of Defendants required that they adequately warn of all

18  safety risks, including the plausibility of and/or the increased risk of cancer.

19      141.    Reasonable care on the part of Defendants required that they adequately warn of the

20  Defendants' failure to conduct adequate tests and studies regarding the plausibility of and/or the

21  increased risk of cancer.

22      142.    Defendants breached these duties.

23      143.    Defendants did not give appropriate warnings about the risk of cancer, which

24  Defendants knew or should have known were involved in the use of Belviq.

25      144.    Defendants did not design and perform adequate and timely testing, studies, and

26  analysis about the risk of cancer, which Defendants knew or should have known was involved in the

27  reasonably foreseeable use of Belviq.

28

145.    Defendants did not properly and adequately monitor the safety data, including adverse events reported about cancer, which Defendants knew or should have known was involved in the reasonably foreseeable use of Belviq.

146.    Defendants did not adequately warn of all safety risks, including the plausibility of and/or the increased risk of cancer.

147.    Defendants did not adequately warn of the Defendants failure to conduct adequate tests and studies regarding the plausibility of and/or the increased risk of cancer.

148.    Defendants' breaches of these duties were substantial factors in causing Plaintiff's injuries.

149.    Plaintiff used Belviq as intended for weight loss management.

150.    Defendants knew or should have known that Belviq could cause cancer.

151.    Specifically, as stated above, two preclinical studies, the two-year carcinogenicity rat study and the two-year carcinogenicity mouse study, demonstrated Belviq's propensity to cause cancer.

152.    The two-year carcinogenicity rat study, the two-year carcinogenicity mouse study, and/or a combination of both, put Defendants on notice, and/or should have put Defendants on notice, that lorcaserin was a carcinogen.

153.    At the very least, these preclinical carcinogenicity studies should have put Defendants on notice that further testing needed to be done, testing that would have confirmed lorcaserin as a carcinogen.

154.    The animal studies, combined with the marginal benefit seen in the clinical studies, was enough to place Defendants on notice of the foreseeable risk of cancer. Indeed, this same evidence led the EDMAC panel to initially vote against approval of Belviq on September 16, 2010, and which led the EMA to determine that Belviq was not approvable due to major objections regarding carcinogenicity and efficacy.

155.    Under these circumstances, a reasonably careful and prudent designer, manufacturer, seller, distributor or supplier of prescription drugs would have provided adequate warnings to

prescribing physicians and/or their patients that Belviq could cause cancer, that preclinical studies found cancer in rats and mice, and that adequate testing had not been performed to confirm Belviq's cancer propensity.

156.    Despite the fact that Defendants knew or should have known that Belviq caused cancer, Defendants sold Belviq to Plaintiff and/or her prescribing physician without properly alerting physicians and their patients, including Plaintiff and her prescribing physician, of the cancer risk.

157.    Defendants knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of their failure to exercise ordinary care by warning about the risk of cancer or warning that Belviq had not been adequately tested.

158.    Defendants had a duty to warn Plaintiff's prescribing physicians of all safety risks associated with Belviq, including its increased risk of causing cancer.

159.    Defendants had a duty to warn Plaintiff and her prescribing physicians that Belviq had not been adequately and/or sufficiently tested regarding its carcinogenicity.

160.    Defendants breached their duties to Plaintiff by failing to exercise reasonable care in warning her and her prescribing physician about the risk of cancer.

161.    As a result of the acts and omissions of Defendants, neither the Plaintiff nor her physicians could have discovered, through the exercise of reasonable due diligence, that exposure to Belviq was associated with increased risks of cancer.

162.    Upon information and belief, had Plaintiff's prescribing physicians been adequately warned of the increased cancer risk associated with Belviq, Plaintiff's prescribing physicians would not have prescribed Belviq to Plaintiff, or the prescribing physician would have relayed the risk of cancer to Plaintiff to allow her to make an informed decision regarding her use of Belviq and Plaintiff would have chosen not to take Belviq.

163.    Upon information and belief, had Plaintiff's prescribing physicians been adequately warned of the increased cancer risk associated with Belviq, even after Plaintiff had stopped using Belviq, Plaintiff's prescribing physicians would have instructed Plaintiff and her other physicians to closely monitor Plaintiff to ensure early cancer detection.

164.    Upon information and belief, had Plaintiff's prescribing physicians been warned of the increased cancer risk associated with Belviq, they would not have prescribed Belviq to Plaintiff or they would have provided Plaintiff with adequate warnings regarding the dangers of Belviq.

165.    Had Plaintiff's physician warned her that Belviq can cause cancer, that it had not been adequately tested, or that she would need to be monitored closely for cancer, Plaintiff would not have used Belviq.

166.    Defendants' negligence in failure to warn Plaintiff and/or her prescribing physician of the risk of cancer, as well as Defendants' failure to adequately test and monitor the safety data of Belviq, were substantial factors in causing Plaintiff's use of Belviq and her subsequent rectal cancer diagnosis.

167.    Subsequent clinical studies conducted from January 2014 to June 2018 confirmed that Belviq causes cancer, including rectal cancer.  These findings led to FDA action and, ultimately, Defendants decided to voluntarily withdraw Belviq from the market on or about February 13, 2020. This was too little, too late for Plaintiff.

168.    Defendants knew, or reasonably should have known, that Belviq was dangerous, or was likely to be dangerous, when used, because it caused an excess risk of cancer. Defendants knew, or reasonably should have known, that users would not realize the danger, because Defendants never adequately warned of the excess risk of cancer in Belviq's label.

169.    Defendants failed to adequately warn of the excess risk and danger of cancer in the Belviq's label. Defendants were negligent by not using reasonable care to warn or instruct about the Belviq's dangerous condition, or about facts that made the Belviq likely to be dangerous, including the risk of cancer.

170.    A reasonable manufacturer/distributor/seller, under the same or similar circumstances, would have warned of the excess risk and danger of cancer in its product's label.

171.    Plaintiff was harmed by Belviq. Plaintiff suffered serious personal injuries, including rectal cancer. Defendants' failure to warn was a substantial factor in causing Plaintiff's harm.

172.    Defendants never warned of the increased risk of cancer from taking Belviq to either

the patients, including Plaintiff, or their prescribing physicians. Defendants had a continuing duty to warn patients and physicians, as long as the product was in use, and constantly failed this duty for as long as the drug was on the market.

173.     Defendants were negligent in their failure to warn of the excess risks of cancer, as well as in the design, testing, and safety monitoring of Belviq.

174.     At all relevant times, and at the time Belviq left the Defendants' control, and before March 2016, Defendants knew or should have known that Belviq was not safe for human consumption, because it caused unreasonably dangerous side effects, including the excess risk of cancer.

175.     At all relevant times, and at the time Belviq left the Defendants' control, Defendants knew or should have known that the safety risks of Belviq (i.e., its carcinogenicity) outweighed any benefits Belviq may have.

176.     Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, sale, and/or distribution of Belviq into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects, such as cancer.

177.     Defendants had a duty to warn Plaintiff and her prescribing healthcare provider, of all safety risks associated with Belviq, including its increased risk of causing cancer.

178.     Defendants had a duty to warn Plaintiff and her prescribing healthcare provider, that Belviq had not been adequately and/or sufficiently tested regarding its carcinogenicity.

179.     Defendants had a duty to adequately and sufficiently test Belviq.

180.     Defendants had a duty to design Belviq in a manner that was safe to its users.

181.     Defendants breached their duties to Plaintiff by failing to exercise ordinary care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Belviq into interstate commerce, in that Defendants knew or should have known that using Belviq created an increased risk of unreasonable, dangerous side effects, including cancer.

182.     Defendants under-reported, underestimated and downplayed the serious dangers of Belviq.

183.     Defendants' inadequate warnings, testing, and safety monitoring of Belviq were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

184.     By reason of the foregoing acts and omissions, Plaintiff was caused to suffer from rectal cancer, compelled to endure chemoradiation therapy treatments, undergo cancer surgery and other treatments and health care (and to incur related medical expenses and costs), and to suffer and continue to suffer other serious and life altering injuries, which are permanent and lasting in nature, including physical pain, mental anguish and distress, and diminished enjoyment of life.

185.     By reason of the foregoing, Plaintiff has been seriously and permanently damaged as a result of Defendant's conduct as described herein.

186.     Defendants' inadequate warnings, testing, and safety monitoring of Belviq were acts that amount to willful, wanton, and/or reckless conduct by Defendants, and demonstrated a conscious disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff.

### SECOND CAUSE OF ACTION
### AS AGAINST ALL DEFENDANTS
### STRICT LIABILITY – FAILURE TO WARN

187.     Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs, inclusive, with the same force and effect as if more fully set forth herein.

188.     Defendants manufactured, distributed, and sold Belviq.

189.     A product is defective when the foreseeable risks of harm from the product could have been reduced or avoided by providing reasonable instructions or warnings, and the failure to provide those instructions or warnings makes the product unreasonably dangerous.

190.     Under California law, a product is defective if unreasonably dangerous even though the seller has exercised all possible care in the preparation and sale of the product. (*See* Judicial Council of California Civil Jury Instructions, 1201, et seq.)

191.    The risk of cancer, including the risk of rectal cancer, was a foreseeable risk that could have been avoided, had Defendants provided reasonable instructions or warnings.

192.    Specifically, based on the two-year carcinogenicity rat study, and the two-year carcinogenicity mouse study, described above, it was known or should have been known by Defendants that Belviq had a propensity to cause cancer.

193.    At the very least, the above-referenced preclinical studies put Defendants on notice of the need to perform adequate testing to confirm the cancer risk.

194.    The animal studies, combined with the marginal benefit seen in the clinical studies, was enough to place Defendants on notice of the foreseeable risk of cancer. Indeed, this same evidence led the EDMAC panel to initially vote against approval of Belviq on September 16, 2010, and led the EMA to determine that Belviq was not approvable due to its cancer risk and marginal efficacy.

195.    Moreover, this same evidence led the EMA to determine that Belviq was not approvable due to major objections regarding carcinogenicity and efficacy.

196.    Subsequent clinical studies conducted from January 2014 to June 2018 confirmed that Belviq causes cancer, including rectal cancer. These findings led to FDA action and, ultimately, Defendants decided to voluntarily withdraw Belviq from the market on or about February 13, 2020. This was too little, too late for Plaintiff.

197.    Defendants failed to warn Plaintiff and her prescribing physician that Belviq could cause cancer, that careful monitoring after using Belviq was needed for early cancer detection, or that it had not been adequately tested.

198.    Upon information and belief, had Plaintiff's prescribing physicians been warned of the increased cancer risk associated with Belviq, Belviq would not have been prescribed to Plaintiff, and/or the prescribing physician would have relayed the risk of cancer to Plaintiff to allow her to make an informed decision regarding her use of Belviq, and/or they would have instructed Plaintiff and her physician to closely monitor the patient to ensure early cancer detection.

199.    Upon information and belief, had Plaintiff's prescribing physicians been warned of

the increased cancer risk associated with Belviq, they would not have prescribed Belviq to Plaintiff, or they would have provided Plaintiff with adequate warnings regarding the dangers of Belviq.

200.     Had Plaintiff's physician warned her that Belviq can cause cancer, that it had not been adequately tested, or that she would need to be monitored closely for cancer, she would not have used Belviq.

201.     Had Plaintiff been warned that Belviq had not been sufficiently and/or adequately tested for safety risks, including cancer, she would not have used Belviq and/or suffered cancer.

202.     Upon information and belief, had Plaintiff's prescribing physicians been warned that Belviq had not been sufficiently and/or adequately tested for safety risks, including cancer, they would not have prescribed Belviq to Plaintiff, or they would have provided Plaintiff with adequate warnings regarding the dangers of Belviq and the inadequate safety data, and she would not have used Belviq and/or suffered cancer.

203.     Defendants' failure to warn Plaintiff and/or her prescribing physicians of the risk of cancer was the proximate cause of Plaintiff's use of Belviq and her subsequent rectal cancer diagnosis.

204.     Defendants' inadequate warnings of Belviq were acts that amount to willful, wanton, and/or reckless conduct by Defendants, and that demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff.

205.     As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects including rectal cancer, more specifically, Stage IIIB rectal cancer, compelled to endure chemoradiation therapy treatments, undergo cancer surgery and other treatments and health care (and to incur related medical expenses and costs), and to suffer and to continue to suffer other serious and life altering injuries which are permanent and lasting in nature, including physical pain, and mental anguish and distress, and diminished enjoyment of life.

206.     By reason of the foregoing, Defendants are strictly liable in tort to the Plaintiff for failing to provide adequate warnings concerning the cancer risk, which made Belviq unreasonably dangerous.

207.    By reason of the foregoing, Plaintiff has been damaged as a result of Defendant's conduct, as described herein.

208.    Belviq had the potential risk of causing cancer and this was known, or should have been known, in light of the nonclinical study findings, as well as the safety data and adverse events reported at the time of manufacture, distribution, and sale of Belviq to Plaintiff from approximately March 2016 through October 2019.

209.    Belviq lacked sufficient warnings regarding the potential risk of cancer.

210.    The potential and serious life-threatening risks of cancer presented a substantial danger when Belviq is used.

211.    Ordinary consumers would not have recognized the potential risks of cancer because Defendants never warned of it.

212.    Defendants failed to adequately warn of the potential risks of cancer in the product label or whenever their sales and marketing personnel met with prescribing physicians.

213.    Plaintiff was harmed by Belviq.  Plaintiff suffered serious personal injuries, including rectal cancer.

214.    The lack of sufficient warnings was a substantial factor in causing Plaintiff's harm.

215.    Defendants failed to properly warn of the increased risk of cancer to the patients, as well as the patients' prescribing physicians.

216.    Defendants had a continuing duty to warn patients and physicians, as long as the product was in use, and constantly failed this duty for as long as the drug was on the market.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against the Defendants on each of the above-referenced claims and Causes of Action and as follows:

1.  Awarding compensatory damages to Plaintiff for past and future damages including, but not limited to, pain and suffering for severe and permanent personal injuries sustained by the Plaintiff,

CLAUDIA HAYES, health care costs, and medical monitoring, together with interest and costs as provided by law;

2.  Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants, who demonstrated a complete and conscious disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff, in an amount sufficient to punish Defendants and deter future similar conduct;

3.  Awarding Plaintiff reasonable attorneys' fees;

4.  Awarding Plaintiff the costs of these proceedings; and

5.  Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues.

Respectfully submitted,

Dated: January 28, 2022          By: /s/Nicholas J. Drakulich

Nicholas J. Drakulich (SBN: 98135)
Robert J. Drakulich (SBN: 281575)
**THE DRAKULICH FIRM, APLC**
2727 Camino Del Rio S., Suite 322
San Diego, CA 92018
Tel: (858) 755-6887
Fax: (858) 755-6456
njd@draklaw.com
rjd@draklaw.com

Daniel J. Thornburgh (PHV Applicant)
Nathan Bess (PHV Applicant)
**AYLSOCK, WITKIN, KREIS &**
**OVERHOLTZ, PLLC**
17 E. Main Street, Suite 200
Pensacola, FL 32502
Tel: (850) 202-1010
Fax: (850) 916-7449
dthornburgh@awko.com
nbess@awko.com

*Attorneys for Plaintiff*

34